[Crim. No. 5175. Fourth Dist., Div. One. Mar. 28, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
NEALY AUBREY JOHNSON, Defendant and Appellant.

**COUNSEL**

Michael H. Walsh, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, William E. James, Assistant Attorney General, Daniel J. Kremer and A. Wells Petersen, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

BROWN (Gerald), P. J.—Nealy Aubrey Johnson, defendant, appeals his conviction, after jury trial, of first degree murder (Pen. Code, § 187).

Mrs. Margaret Lewis and her daughter, Katherine, the murder victim, lived in a one bedroom apartment in San Diego. Johnson lived with Mrs. Lewis and Katherine during the summer of 1970; after August of 1970 Johnson stayed at the apartment on weekends only. When Johnson stayed at the apartment, he and Mrs. Lewis would sleep in the bedroom, and Katherine would sleep on the couch in the living room. On the evening of October 12, 1970, Mrs. Lewis was admitted to the hospital for surgery. She planned to remain in the hospital for about two weeks; Johnson had agreed to take care of Katherine during Mrs. Lewis' absence. Johnson did not have a key to the apartment, and Katherine was to leave the sliding glass door unlocked. Johnson left Mrs. Lewis at the hospital about 7 p.m. He said he was going directly to the apartment.

Three of Katherine's friends were with her at the apartment until 9:20 p.m. At 9 Johnson called Katherine and told her he would not arrive until 10. Mrs. Lewis called Katherine about 10:15 and said her surgery had been cancelled. Johnson had not returned to the apartment. At 10:30 Mrs. Lewis again called Katherine. Johnson still had not returned, and she asked Katherine to have Johnson call her when he came in. Katherine wrote Johnson a note to this effect which was later found by the telephone. Mrs.

Lewis called again at 10:50 and at 11:15. Katherine told Mrs. Lewis she had called the Club Cabrillo and had been told Johnson had left there at 10:55 p.m. One of Katherine's friends called her about 11:30. Katherine ended that conversation about 11:45, saying someone was coming and she had to go. Mrs. Lewis called again about midnight. Katherine told Mrs. Lewis she was in bed, and had been trying to sleep.

Johnson, after leaving Mrs. Lewis at the hospital, went to the Club Cabrillo, where he helped the owner serve beer. He dropped three bottles of beer, and cleaned up the broken glass. When he left the Club Cabrillo at 10:55 there were no cuts on his hands. Johnson went to the VFW bar, and stayed there until midnight, then went to the Presidio Bar. Johnson met Barry Burrow, a friend, and Phyllis Hunkins, who was with Burrow. Johnson, Burrow, and Hunkins left the bar at 1 a.m. in Johnson's car. After leaving Hunkins at her apartment, Johnson drove Burrow to the Marine Corps Recruit Depot (MCRD) barracks. Johnson returned to Hunkins' apartment alone, and asked her to invite him in for a drink or a cup of coffee. Hunkins refused. As Johnson was leaving the apartment building, he saw another apartment he thought belonged to a friend. Johnson knocked on the door, it swung open and he walked in. Norma Marler was in bed in the front room. She rushed at Johnson and pushed him out the front door. Three men, including Mrs. Marler's son and one of his friends were also in the apartment; in the scuffle outside Mrs. Marler's apartment involving all these individuals, Johnson hit Mrs. Marler in the mouth and then fled. Mrs. Marler called the police and reported the incident. Johnson returned for his car a few minutes later, and drove to a small beer bar, arriving there about 1:30 and leaving about 10 minutes later.

Michael Revetti lived in an apartment next to the Lewis apartment; the two apartments' bedrooms and bathrooms shared a common wall. The sound insulation between the apartments was poor, and in his apartment Revetti could hear even normal conversations in the Lewis' apartment. Revetti returned to his apartment on October 13 at 1:15 a.m. At 1:30 he went to his bathroom to take a shower. He could hear shower water running in the Lewis bathroom. After showering, Revetti read in his apartment from 1:45 to 2:45. He was sitting in his dining area, about 8 feet from the common wall with the Lewis apartment. The apartment was quiet; he heard no noises in the Lewis apartment.

Joseph Weeks and Cynthia Thomas walked across the parking area of the Lewis apartment building at 2:15. Weeks saw the light in Revetti's apartment, and noticed although the Lewis apartment was dark and the drapes were drawn, the sliding glass door and screen door were both stand-

ing open. He remarked to Miss Thomas this was unusual because the evening was cold.

Revetti went to bed at 2:45. He heard heavy wheezing sounds, like labored breathing, coming from the Lewis apartment. At 3 he heard a thump, sounding like someone falling out of bed. Afterwards, the Lewis apartment was quiet.

Johnson told the police the next day he returned to the MCRD barracks after leaving the beer bar at 1:45. He said he called Mrs. Lewis from a pay phone on the base about 2:15. Mrs. Lewis recalled receiving the call at 2:35; she said Johnson's voice was unusually hoarse and low, as though he were talking with his hand on the receiver. Johnson also called a girl he had seen earlier in the Club Cabrillo some time after 2 a.m. Johnson said when he returned to the barracks the duty NCO was not at his desk. Johnson said he fell asleep on the toilet, awoke about 3:30, and went to bed. A fellow marine woke Johnson at 6 on the morning of the 13th. The duty NCO did not see Johnson return and did not see him in the barracks that night. Part of his duties included regularly checking the rest rooms.

Mrs. Lewis called her apartment early on the morning of the 13th. No one answered, so Mrs. Lewis called the apartment manager at 6:50 a.m. and asked her to check the apartment. The manager entered the apartment using the passkey. The screen door and sliding door were open. She found Katherine in the bedroom, dead.

Katherine was lying on her back between the twin beds. She was wearing only a shortie nightgown which was gathered above her breasts. Her underpants lay on the floor nearby. Katherine had been severely beaten, and stabbed three times in the back. Her jaw was broken on both the left and right sides; dislodged teeth and bone fragments were found inside her mouth. Her face had minor cuts and scratches. One of the three stab wounds in her back had penetrated the body cavity. Katherine's death resulted from a combination of bleeding, asphyxiation resulting from injuries to her face, bleeding in her hypopharynx and trachea, and shock. Katherine lived at least one hour after she was injured, and could have lived as long as six hours. The pathologist could not establish the time of death. A large quantity of blood was found on the bed, with a smaller quantity on the floor.

An examination of Katherine's body for evidence of rape showed no trace of recent intercourse, or of injury to her genitalia. Her vaginal opening suggested she had been sexually active. Her underpants were not ripped or torn, and had no trace of semen. In addition to the stab wounds in

her back, Katherine had been cut and stabbed on her chest and stomach. These wounds were not very deep.

Katherine had Type A blood; Johnson's blood type was B. Katherine's body and face were bloody. A blood crust of Type B was found on her inner leg about one inch from her vagina. A blood smear of Type B was found on her thigh. Bloody palm prints on the bed sheet contained both types of blood. The bathroom basin had Type A blood on it, as did a damp bath towel found in the hamper. The telephone receiver had a light smear of Type B blood; the face of the phone had specks of Type A blood. Three walls and the ceiling of the bedroom were spattered with blood.

The couch in the living room had been made up into a bed, which had not been slept in. The telephone, normally kept in the living room, was in the bedroom. A steak knife had a small amount of Type A blood on the blade near the handle. A fresh fingerprint, never identified, was on the outside of the sliding glass door near the handle. Human hair distinguishable from Johnson's, Mrs. Lewis' and Katherine's, was found in Katherine's nightgown and on the blanket of the bed. Other, unidentified hair was found in the bedding on the couch.

Johnson had a laceration on one of the knuckles of his right hand on October 13. His hand was slightly puffy and bruised. There was a small cut between two fingers. Johnson said he had hit a small wooden sign at MCRD on the morning of October 13. The sign, which had been nailed down, was dislodged.

## Issues

Johnson argues he was denied a fair trial when expert testimony on the identity of the maker of the bloody palm prints was admitted, and when the trial court denied his motion to discover the names of experts who had examined the palm prints for the prosecution while the trial was in progress and who believed the prints' maker could not be determined; the People were not calling these experts as witnesses. Johnson maintains the evidence is insufficient to support a finding of first degree murder. He contends his pretrial motions to quash the grand jury indictment and to prohibit exclusion of certain petit jurors were erroneously denied.

## Discussion

### Discovery of Experts' Identity

■ The prosecution presented the testimony of one expert witness the bloody palm prints left on the sheet were Johnson's. After the People rested, Johnson presented two experts who testified the prints were not his.

He then moved to discover the identity of any experts to whom the prosecution had shown the prints whose opinion was the maker could not be identified. The district attorney admitted he had shown the prints to some experts, while the trial was in progress, who said the prints' maker could not be determined.[1] He argued against allowing discovery, saying this information could not possibly assist the defendant's case.[2] The trial court refused discovery. Another expert testified at trial the print could not have been Johnson's. Finally, at the close of trial, the prosecution and defense introduced by stipulation, two other experts' opinions, one favoring each side. Thus, the jury was told by two experts the print was Johnson's, while four experts were of the opinion Johnson was not the maker of the print.

We conclude denial of the defense motion to discover the identities of the experts was erroneous.

■ While a mere desire by a criminal defendant to inspect all the information obtained by the People in their investigation cannot compel discovery (*People* v. *Cooper,* 53 Cal.2d 755, 770 [3 Cal.Rptr. 148, 349 P.2d 964]), any information which may throw light on issues in the case should not be denied the accused (*People* v. *Riser,* 47 Cal.2d 566, 586 [305 P.2d 1], overruled on other grounds, *People* v. *Morse,* 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]). ■ Information, to be discoverable, need not necessarily be relevant to the ultimate issue of the accused's guilt or innocence. The defendant also has the right to discovery evidence by which he may rigorously cross-examine and impeach the witnesses against him (*People* v. *Riser, supra,* 47 Cal.2d 566, 586). ■ Where it is appropriate, the defendant may discover the reports of the state's experts concerning their examinations of real evidence (*People* v. *Cooper, supra,* 53 Cal.2d 755, 770); discovery of the identity of state experts is analogous. (See *Hill* v. *Superior Court,* 10 Cal.3d 812 [112 Cal.Rptr. 257, 518 P.2d 1353].)

■ Here, Johnson's requested discovery could have led to information highly beneficial to him. An expert examining the print could have come

---

[1]In advance of trial on defendant's motion the court had ordered extensive discovery. This court granted Johnson's petition for writ of mandate to discover specific items in the People's possession, relevant to the defense (Johnson v. Superior Court, 4 Civ. 11154). During trial Johnson argued he should be permitted discovery of the experts' identities, based on the pretrial discovery orders. The prosecution countered by saying it had complied with those orders, and argued the information sought by Johnson would not be favorable to him.

[2]Although Johnson's attorney speculated these experts might be with the Los Angeles Police Department (LAPD), the prosecutor admitted only such experts existed. Nothing in the record permits the conclusion these experts were with the LAPD, or were readily available to Johnson.

to four conclusions: (1) Johnson made it; (2) someone other than Johnson made it; (3) he could not determine who made it; or (4) the print was of such poor quality no identification was possible. An expert arriving at the third or fourth conclusion is not the equivalent of one having no opinion. Because the state bore the burden of proving Johnson's guilt beyond a reasonable doubt, proof the print's maker could not be determined would have been helpful to Johnson, by throwing doubt on the People's case. The trial court's refusal to allow discovery denied Johnson valuable information which he could have used to cross-examine, impeach the expert who testified against him, and argue more vigorously the People's failure to prove guilt beyond a reasonable doubt.

■ Intentional suppression of material evidence, upon request, constitutes a denial of fair trial to a defendant, and is error (*In re Ferguson,* 5 Cal.3d 525, 532, 534 [96 Cal.Rptr. 594, 487 P.2d 1234]). The error is reversible if there was a reasonable probability the accused would have obtained a more favorable result in its absence (*People* v. *Riser, supra,* 47 Cal.2d 566, 588). Stated otherwise, whether the error is reversible depends on the materiality of the evidence sought, which is determined in the light of all the circumstances, including not only the evidence of guilt, but also the defense evidence (*In re Ferguson, supra,* 5 Cal.3d 525, 533).

■ We shall explain why there is a reasonable probability Johnson would have obtained a more favorable result had the trial court permitted Johnson to discover the identities of the People's experts who were not called as witnesses.

The evidence of Johnson's guilt, although not insubstantial, is not compelling. Johnson's movements were known until about 1:45 a.m. on the night of the murder, but were not firmly established after that time. Revetti heard sounds like labored breathing in the Lewis apartment about 2:45, and a thump like someone falling out of bed at 3. These, the prosecution contended, were the sounds of the murder being committed. On Katherine's body, and in various places in the apartment, Type B blood was found. Johnson has Type B blood, as does 15 percent of the population. Johnson's hand had injuries the morning after the murder not inconsistent with the beating Katherine received. Johnson knew Katherine would be home alone, and had access to the apartment.

The defense showed hair not Johnson's, Katherine's, or Mrs. Lewis' was found on Katherine's nightgown. A fresh fingerprint, unidentified, was on the sliding glass door, which was found open. There were unidentified footprints in the earth outside the sliding glass door. At 11:45 Katherine told her boyfriend she could not talk on the telephone any longer because

someone was coming. When Mrs. Lewis called about 11:55 the telephone rang several times before Katherine answered it and complained she was trying to sleep. Although Katherine told her mother at midnight she was going to sleep, at 1:30, before Johnson could have been there, Revetti heard the shower in the Lewis apartment. The defense argued the sounds of labored breathing Revetti heard at about 2:45 and the thump of someone falling out of bed, were more consistent with Katherine's death throes than with the sounds of the murder being committed, considering the severity of the beating Katherine received; the injuries to Johnson's hand occurred during the scuffle at Marler's apartment or when he hit the sign at the MCRD; and the puncture wounds on Katherine's face showed she was beaten by someone who wore a ring, which Johnson never did.

The most significant evidence in the case is the bloody palm print. The jury heard evidence the print was Johnson's, and evidence it was not. No evidence was presented the print could not be identified. The print, probably too large to be Katherine's, and containing Type A and B blood, was undoubtedly made by the murderer. The jury must have concluded the print was Johnson's; they would not have found him guilty if they believed the print belonged to someone else, and they heard no evidence the print could not be identified. Once Johnson was identified as the print's maker, no reasonable doubt of his guilt remained.

It is arguable the harm of denying discovery was not great. Johnson presented evidence the print was not his. The experts whose names he sought would have impeached or cast doubt upon the testimony of those who believed the print was not his, as well as those who thought it was. The prosecuting attorney argued to the jury none of the defense experts were currently involved in active fingerprint investigation. These experts were, in fact, retired police officers. On the other hand, the prosecution expert who testified was currently involved in day-to-day investigations, and was called to testify often in criminal trials. The prosecutor argued the People's expert had much more to lose professionally than did the defense experts, if his testimony was not believed. This argument clinches the importance of the information Johnson sought. Although not precluded from presenting evidence the print was unidentifiable, Johnson was prevented from obtaining this potent evidence from fingerprint experts employed by the People.

## ADMISSIBILITY OF EXPERT TESTIMONY

█ The bloody, *untreated* palm prints on the bed sheet did not contain enough detail to identify their maker. The trial court ordered the prosecu-

tion not to submit the print to any process which might destroy or consume it without first obtaining court permission. The prosecution submitted the print to computer analysis at Jet Propulsion Laboratory (JPL), and, after a lengthy hearing, expert testimony based on the computer-obtained print was ruled inadmissible. During the trial, without informing the court or Johnson's attorney, the prosecution had the print sprayed with benzidine, hoping to enhance the print pattern. Johnson's attorney objected to expert testimony based on the treated print. He argued (1) the expert's opinion was based on the excluded JPL supplied print, (2) the reliability of the benzidine process was unproven, (3) the benzidine processing may have changed some characteristics of the print and (4) the processing was carried out in violation of the court order. The court found the expert's opinion was formed independent of the JPL print, ruled Johnson's other objections went to the weight and not to the admissibility of the expert's testimony, and admitted the testimony.

On appeal Johnson maintains the treatment of the palm print with benzidine obliterated a portion of it. He argues the portion which was destroyed may have proven he was not the maker of the print. He contends the prosecution should not have been allowed to admit the treated print into evidence. Because this issue may arise again on retrial, it is discussed here.

If the prosecution or the police have destroyed or made unavailable vital defense evidence, the state is disabled from ever giving the defendant a fair trial. In such a case the defendant must be discharged (*In re Cameron,* 68 Cal.2d 487, 504 [67 Cal.Rptr. 529, 439 P.2d 633]). Whether the People have denied the defendant evidence vital to his case will not normally bear on the admissibility of other, relevant evidence. Here, the disputed palm prints were found admissible by the court. The court ruled the expert's testimony was not tainted by his earlier contact with the JPL supplied evidence. If, as Johnson now contends, the prosecution, by spraying the bed sheet with benzidine, denied to him vital defense evidence, his proper remedy was not to question the admissibility of otherwise admissible evidence. The print and expert testimony were properly admitted.

### SUFFICIENCY OF THE EVIDENCE

■ Johnson contends the evidence against him was not sufficient to support a first degree murder conviction, either on a theory of premeditation, or on a felony-murder theory. He argues even though the conviction *must* be reversed on other grounds, on retrial he may be charged with no

more than second degree murder, since the evidence presented in the first trial would have sustained no more than a second degree murder conviction.

The reversal of a judgment of conviction on appeal is generally deemed an order for a new trial (Pen. Code, § 1262). At a new trial, the parties are in the same position as if no trial had been had; the former verdict does not bar any conviction which might have occurred under the original accusatory pleading (Pen. Code, § 1180; *Odlum* v. *Duffy,* 35 Cal.2d 562, 564-565 [219 P.2d 785]). An exception to this rule is conviction of a lesser degree of a crime, or of a lesser included offense, which bars, on retrial, prosecution for the higher degree or greater offense. Thus, if Johnson had been convicted of second degree murder, on retrial he could not be convicted of first degree murder (*Gomez* v. *Superior Court,* 50 Cal.2d 640, 643-649 [328 P.2d 976]). The exception, however, should not be extended to cases where the defendant has been convicted of the greater offense on what he claims is insufficient evidence. The rationale of *Gomez* is the conviction of the lesser offense is an implied acquittal of the greater offense (*Gomez* v. *Superior Court, supra,* 50 Cal.2d 640, 645). In this case there was no implied acquittal of the greater offense; here Johnson was convicted of first degree murder. On retrial, Johnson may be prosecuted for first degree murder; of course, he may receive no greater sentence than he received following his original conviction (*People* v. *Henderson,* 60 Cal.2d 482, 495-497 [35 Cal.Rptr. 77, 386 P.2d 677]).

Since Johnson's conviction must be reversed on other grounds, the other issues he raises concerning problems which occurred at trial need not be discussed. Johnson may not receive the death penalty on retrial. Jurors who would never impose the death penalty may not be excluded from the guilt phase of trial on retrial.

### GRAND JURY INDICTMENT

Johnson moved before trial to quash the indictment, contending the grand jury selection process deprived him of equal protection and due process of law. Many San Diego Superior Court judges testified concerning the selection process used for nominating grand jurors. The judges testified no group of persons was intentionally excluded from grand jury service, but there was some difficulty in obtaining the services of the lower economic groups, or blue collar workers, because the pay of a grand juror would not sufficiently reimburse them for their time.

Mr. Michael Lustig, a Ph.D. candidate in sociology, prepared three studies of the San Diego County Grand Jury's composition. The first study was of grand jury members between 1962 and 1971. The occupation, sex

and income of the members of the grand jury during this period was shown. The actual income of the grand jurors could not be determined, so Lustig's study instead showed the median income of the census tract in which the member resided. The ages of the grand jurors between 1968 and 1971 were shown. The second study was of the nominees for the grand jury in 1970, and showed their occupations, sex and census tract income. The third study was of the nominees for the 1971 grand jury, and contained their occupations, sex and census tract income.[3]

The trial court denied Johnson's motion to quash the indictment. He argues this was error. Although the judgment of conviction must be reversed, whether the trial court erred in denying the order must be resolved, since Johnson may again stand trial under the same indictment.[4]

---

[3]Nine occupational categories are provided by the United States Census Bureau: 1) professional, technical and kindred workers; 2) managers, officials and proprietors; 3) clerical and kindred workers; 4) sales workers; 5) craftsmen, foremen and kindred workers; 6) operative and kindred workers; 7) private household workers; 8) service workers; 9) laborers, including farm laborers, but excluding mine workers. To complete his study, Lustig also classified grand jurors and nominees into five other occupational categories: 10) military; 11) retired; 12) housewife; 13) dispute; 14) unknown.

Categories one through four were typed by Lustig as "white collar" occupations; five through nine as "blue collar." Categories 10 through 14 were typed as "inactive labor force."

Lustig used the U.S. Census figures as representative of San Diego County population as a whole. The appellant's brief summarized Lustig's studies: "The Lustig studies, based upon raw materials provided by the San Diego County Jury Commissioner convincingly show 99% of all grand jurors from 1962 through 1971 were so-called white collar workers . . . 94% of 1971 grand jury nominees similarly were white collar . . . These figures . . . contrast with . . . 45.14% of the San Diego labor force classified in . . . the blue collar . . . categories. From 1962 to 1971, on the San Diego County Grand Jury, men outnumbered women four to one notwithstanding a 1.1 to 1 ratio in the population. Grand jurors from 1962 through 1971 have resided . . . in higher median family income census tracts than is truly representative of a cross section of census tract median family income residence. No one under 30 has been named a grand juror from 1968 through 1971. While 54.80% of the 1970 San Diego population is within the age bracket 21 to 44, only 14.86% of grand jurors from 1968 to 1971 are within that age bracket."

[4]Reversal of an otherwise valid conviction because of some irregularity in the indicting procedure would seem, at first glance, unwarranted. The standard of proof of guilt is much higher to convict than indict. Certain evidence not admissible at trial because of the exclusionary rule is admissible before the grand jury. When the prosecution has obtained a valid conviction, its ability to have obtained an indictment before a properly constituted grand jury would seem a foregone conclusion. In addition, if a defendant's motion to quash an indictment has been improperly denied, and reversal must eventually result, he will be given two opportunities to test the prosecution's case. The courts, however, have accepted the proposition an invalid indictment must necessarily result in reversal of an otherwise valid conviction (*Peters* v. *Kiff*, 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163]; *In re Wells*, 20 Cal.App.3d 640, 649-651 [98 Cal.Rptr. 1]). A preferable rule would be to require

The California statutes governing selection of grand juries are neither unconstitutionally vague nor do they invite discrimination (*In re Wells, supra,* 20 Cal.App.3d 640, 649).

Johnson contends the grand jury selection and nominations in San Diego County have discriminated by sex, age, wealth, occupation, and have resulted in grand juries not representative of the community. He argues his indictment deprived him of equal protection and due process of law.

Johnson maintains the classes excluded from grand jury service are women, blue collar workers, the less wealthy and young persons. The People note there was no showing Johnson is within any of these excluded classes, and thus he does not have standing to protest their exclusion. In order to protest the make-up of a jury panel, the long-standing rule in California has been a defendant must be a member of a group discriminated against (*People* v. *Sirhan,* 7 Cal.3d 710, 753 [102 Cal.Rptr. 385, 497 P.2d 1121], citing cases). The United States Supreme Court in *Peters* v. *Kiff, supra,* 407 U.S. 493, at page 504 [33 L.Ed.2d 83, at page 95], held: "[W]hatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law." The People suggest this rule should be strictly construed, and only where the defendant alleges racial discrimination may he challenge exclusion of a group of which he is not a member. The rule of *Peters* cannot be limited to this extent. The rationale behind the *Peters* decision extends far beyond the racial context; *Peters* was aimed at eliminating exclusion of "any large and identifiable segment of the community" from jury service, not merely exclusion of racial groups (*Peters* v. *Kiff, supra,* 407 U.S. 493, 503 [33 L.Ed.2d 83, 94]).[5]

the defendant to test the validity of the indictment by way of writ in the appellate courts, and foreclose him from raising this point on appeal. Such a rule has been adopted by the statutes with regard to motions challenging venue in civil matters (Code Civ. Proc., § 400).

[5]The exclusion of a "substantial and identifiable class of citizens" renders the jury selection system arbitrary and discriminatory, and the indictment invalid. The test is whether the exclusion of the class would "remove from the jury room qualities of human nature and varieties of human experience," and deprive the jury "of a perspective on human events that may have unsuspected importance. . . ." (*Peters* v. *Kiff, supra,* 407 U.S. 493, 503-504 [33 L.Ed.2d 83, 94]). Another test is whether the group excluded is "fungible" with the jury panel, whether "a community made up exclusively of one is different from a community composed of both" (*Ballard* v. *United States,* 329 U.S. 187, 193-194 [91 L.Ed. 181, 186, 67 S.Ct. 261]). Whether exclusion of a certain age group or economic group is erroneous is difficult to determine. Age groups are defined arbitrarily, and unless the size of the grand jury is substantially increased, the exclusion of some arbitrarily defined age group over a limited number of years is unavoidable. The same is true of economic groups based

In the present case Johnson has not demonstrated he is within any of the groups allegedly excluded from grand jury service: he is neither a woman nor a blue collar worker, and the record does not reveal his age or his wealth. *Peters* v. *Kiff, supra,* 407 U.S. 493, was decided June 22, 1972, long after Johnson's indictment was returned and his trial completed. The rule of *Peters* is purely prospective in operation (*People* v. *Sirhan, supra,* 7 Cal.3d 710, 754), and Johnson was, at the time of his motion, required to show standing to assert class exclusion from grand jury service. The order properly denied his motion to quash the indictment.

The judgment is reversed.

Cologne, J., concurred.

**WHELAN, J.**—I dissent respectfully and only as to the existence of any ground for reversal, and address myself to the questions whether the trial court abused its discretion in refusing to order the prosecution to disclose the name or names of one or more fingerprint identification experts who examined the palm print or a photograph thereof and who took the position the print was not clear enough to make any identification at all; and if there were an abuse of discretion, whether the judgment must be reversed for such error.

It appears defense counsel did not at any time tell the court he intended or desired to call any such expert to testify that in his opinion the print was unidentifiable. The matter was discussed on four different days, after the People had rested and defense counsel had made his opening statement on December 2; first on Monday, December 6, 1971, when defense counsel stated to the court: "There will be additional witnesses involved under Brady vs. Maryland, witnesses questioned by the prosecution, whom the prosecution has approached. I was told over the weekend by a reliable source—whether this is one hundred percent accurate or not I can't say—other than the fact on information and belief I was told that they approached the LAPD to see if they would back them up on the print and the Los Angeles Police Department declined. I want to make a motion under Brady vs. Maryland for the names of the individuals they have approached who

---

on wealth or job title. In order to rely on the exclusion of an age or economic unit from jury service as a challenge to the jury, the defendant should show exclusion of that group will remove from the jury significant qualities, and deprive it of important perspectives. He does not, of course, have to demonstrate actual prejudice.

won't back them up so that I have an opportunity to approach the same people."[1]

Thereafter the defense presented the testimony of three fingerprint identification experts, that of Meyers on December 6, that of Stahl and Smith on December 7. Each testified the palm print had been made by someone other than defendant. Meyers testified also he would not "rely on that print for a positive identification of anyone," in response to a question put to him by defense counsel in which that exact language was used. When he questioned his two other experts later, defense counsel did not pose that question to either of them.

After the jury was excused on December 7 until Friday, December 10, defense counsel informed the court he desired the name of any expert consulted by the prosecution "who states that either the print is not identifiable at all or that there are not sufficient characteristics to positively identify it as the Defendant's" so he could "personally talk with them to determine whether . . . they may fall in category number one; whether further examination would be material." Category number one was that of a positive opinion the print was not defendant's.

This exchange follows: "THE COURT: If they are going to come in and testify it is inconclusive, I want you to understand I, *at this point,* would not allow such testimony. [Italics added.]

"MR. WALSH [defense counsel]: I would represent to the Court I don't have any intention of calling such witnesses. My position is I am entitled, under Brady, to be given the names of those individuals in category number two, that include those individuals who have examined the print and not been able to conclusively establish it as having been made by the Defendant. In other words, they are people who feel the print itself isn't identifiable at all, or there are some points but not a sufficient number, and all I am saying that I want is the names of those people so I can approach them and see whether or not that they considered what I believe is clear evidence positively excluding the Defendant. That is all I am saying.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"MR. WALSH: I am only talking about evidence in category two. I have

---

[1]At oral argument counsel stated that while at the Sacramento airport on a Saturday during the trial he was told by a man whom he had arranged to meet there for a conference that the prosecution had consulted experts in the CII who were unable to arrive at any positive opinion with regard to the print. That must have been a lapse of memory; the statement made during trial is the more likely.

already made myself clear. I don't intend to introduce inconclusive evidence."

The matter was discussed further the following morning, December 8, when defense counsel urged his right to the name or names he sought based upon an earlier order reflected in the minutes of June 2, 1971, which recite: "The court grants a motion for continuing order of discovery for items previously ordered discovered and falling within categories authorized for discovery." The order seems to have been made as the result of a motion of which notice was filed May 21, 1971, for discovery of: ". . . [a]ll information in the possession of the prosecution or any law enforcement authorities which is conceivably favorable to the defense."

On December 8, counsel stated: "[M]y position is, as I said yesterday, your Honor, that under Brady and under the theory of similar cases I have the right to just know who that is, so I can go to see him. I would say, 'Sir, did you, in making your examination consider this fact, this fact and this fact that may tend to establish that it could not have been made by the Defendant?'

"I made very clear yesterday I had no intention—I don't think the law permits me to call an individual who says he doesn't know."

The subject was mentioned finally on December 17. The trial had been recessed from December 10 to December 17, except for a brief session on December 13 when a judge other than the trial judge made an order of continuance until December 17. The defense rested its case on December 17. Thereafter defense counsel made this statement: "Mr. WALSH: There's one other matter I would want to bring to the Court's attention, your Honor. Last week when we were talking about the motion under Brady against Maryland, and the similar California cases, for the names of any experts whom the print was shown, who took the position that it was not identifiable one way or the other, and counsel indicated there were some people in that category, I stated and I read in the record, and I want to say now I did not mean to say this, so I want to correct the record. In other words, I stated I didn't feel that evidence standing in that posture was permissible, that is, a witness taking the stand and saying there's not enough here to identify it one way or the other. I simply stated that by error.

"I was thinking back to the question we had discussed at length earlier in chambers, that is, where a witness would take the stand and say, 'Well, it was similar,' but he couldn't say it was identical. I have taken the position consistently that it was not admissible, but I did not mean to state

in making the Brady motion that testimony, that there is insufficient detail to make any identification of anybody, that that was inadmissible. I read that in the record over the weekend break and I want to make it clear that I simply misstated myself.

"     .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"When I read the record over the weekend I thought I had made the argument, but I intended to make it, that we have the right to the names of those people to see if with further discussion they might become excluders, but I stated on the record that I didn't feel if they stayed in the middle their testimony would be admissible. That was a misstatement on my part."

Further justification for the belief defense counsel did not wish to call witnesses to testify the print was unidentifiable could have been found in the fact that, having elicited such an opinion from Meyers, he had refrained from that tactic in his subsequent examination of Stahl and Smith, all before he made his representations to the trial court.

Later, in his argument to the jury he relied heavily upon the positive nature of his expert testimony and the skill and experience of the men who gave it.[2] In support of the standing and importance of his expert witnesses, he also emphasized that the prosecution had first sought to consult Meyers to see if he could identify the print as that of defendant.

On the other hand, defense counsel ridiculed what he considered an attempt by the prosecution to escape the force of the defense testimony by questioning the quality of the print for identification purposes.[3]

---

[2]The following are a few excerpts from that part of the argument dealing with the palm print evidence: "We have, in fact, produced positive evidence, positive evidence that Nealy Aubrey Johnson did not commit the crime in question. By the testimony of four distinguished fingerprint experts you have heard that that bloody print on the bed sheet positively could not have been made by Nealy Aubrey Johnson."

". . . the positive exclusion by four competent experts . . ."

"[W]hat more positive evidence could a defendant produce than fingerprint evidence excluding him . . . ."

"[T]here are four considerations I want you to go into that jury room with; there are four things that I just suggest you can't get away from in this case.

"The first are those four eminent fingerprint experts who positively exclude Nealy Aubrey Johnson as the man who made those prints."

[3]"They introduce that print to ask you to convict Nealy Johnson of the most serious crime that exists on the statutes of this country. They weren't worried at that point about whether it was a poor print. They weren't worried about whether it was difficult to work with. They weren't worried about whether the prints were indistinct, they were worried about recording differences or about whether blood was a poor recording medium. It is kind of curious.

"When competent witnesses took the stand and positively excluded Nealy John-

A further circumstance bearing on the question is that there was no claim there had been error in that ruling of the court in either of two motions for new trial made and argued by defendant.[4]

If it be granted the court erroneously stated evidence the palm print was unidentifiable was inadmissible, the trial judge was entitled, in the context in which the defense request was presented to him, to believe the statement of counsel he did not intend to present such evidence and wanted the name or names of the expert or experts to see if they could not, as the result of further study, come to an opinion positively excluding defendant as the maker of the print. When on December 17 defense counsel corrected his earlier view evidence was inadmissible that the print was unidentifiable, he still did not say he desired to present such evidence.

The judgment should not be reversed because of an erroneous view of the law on the part of the trial judge when the point was not necessary to the court's ruling on the request for discovery. It must first appear that the court abused its discretion. (Hall v. Superior Court [L. A. No. 31072—Feb. 25, 1974].)

The question presented was whether defendant was entitled to have fed to him the names of experts who might possibly arrive at a positive excluding opinion, and that for the sole reason they had already examined the exemplars. While that might make it more convenient for counsel, the refusal of the court to grant the request was not a denial of due process or a fair trial. In the setting in which the request was made it must have been evident that defense counsel had ready access to the names of experts in the field: Meyers had been in charge of fingerprints at the San Diego Police Department for 15 years; Stahl, until he retired in 1963, had for 22 years been head of the latent fingerprint section of the Los Angeles Police Department; Smith had been in that same department for 15 years until August 1970. It was in the Los Angeles Police Department that defense counsel said the unnamed expert or experts were who had been consulted by the prosecution. The witnesses Stahl and Smith would have been acquainted with the names of experts in that field in the Los Angeles Police Department; and, in general, although the art itself may be esoteric, knowledge of the names of its practitioners is by no means so.

---

son, the prosecution turned on its own print. How do you feel about that? It was good enough to ask you to convict a man of murder without any of those qualifications, but when it positively excludes the man on trial, it is suddenly not a reliable piece of evidence."

[4]The first motion was made before the trial as to penalty, so as to make that phase of the trial unnecessary; the second, after the penalty phase.

If defendant's request or motion sought discovery for the purpose stated to the court, there was no prejudice in the denial. If defense counsel did not know the names of experts in the Los Angeles Police Department who might have been interviewed by the prosecution, the names of all experts in that department were ascertainable, and those experts could have been interviewed by him. Between the time the court ruled on defendant's motion (Dec. 8), the trial was not in progress until December 17, with the exception of December 10. That unforeseen interval in the course of a trial should have afforded defense counsel sufficient opportunity, by his own efforts, to get in touch with any experts in the Los Angeles Police Department who had examined the exemplars. He had in fact, by December 20, obtained a fourth expert opinion that the print was not defendant's. So far as we know, that expert, Norman Readdy, may have been one of those from the Los Angeles Police Department whom the prosecution had interviewed earlier.

Defendant must show prejudice. (*Ballard* v. *Superior Court,* 64 Cal.2d 159, 167 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].)

In a case in which the defendant sought discovery of 13 named persons interviewed by the prosecution, of whom only three were called as witnesses, the reviewing court said: "Only three of the named persons whose statements were demanded were called by the prosecution as witnesses, and defendant was furnished copies of the statements of all three. The names of all were known to defendant and the record is silent as to whether he interviewed or attempted to interview any or all of them. 'Although the defendant does not have to show . . . that the evidence which he seeks to have produced would be admissible at the trial [citations], he does have to show some better cause for inspection than a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.' (*People* v. *Cooper,* 53 Cal.2d 755, 770 . . . .)" (*People* v. *Lane* 56 Cal.2d 773, 786 [16 Cal.Rptr. 801, 366 P.2d 57].)

In California there is no statutory scheme for discovery in criminal cases, except the requirement that the names of witnesses before the grand jury and a transcript of their testimony be furnished. Where the process does not arise by indictment, a preliminary hearing may serve the same purpose.

In the absence of express legislation on the subject, the courts have deemed it appropriate to develop rules governing discovery (*Jones* v. *Superior Court,* 58 Cal.2d 56 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R. 2d 1213]).

It has resulted that many cases involving the right to discovery have been decided on an *ad hoc* basis. While there are well-defined areas where discovery is compellable, there remain areas where the question is addressed to the sound discretion of the trial court. The area of discretion is that in which reasonable minds might differ.

That is true in the federal courts working under rule 16 of the Rules of Criminal Procedure, which declares a right of discovery of: ". . . results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government . . . ."

Those rules have been one of the bases of the "Standards Relating to Discovery and Procedure Before Trial" approved by the American Bar Association; and the following cases, decided under the federal rules, throw some light on the problem.

Rule 16(b) of the federal rules permits discovery more broadly than due process requires. (*United States* v. *White* (5th Cir.) 450 F.2d 264, 268-269; *United States* v. *Conder* (6th Cir.) 423 F.2d 904, 911.)

In *Link* v. *United States* (8th Cir.) 352 F.2d 207, 212, the defense claimed the government had failed to disclose that it had unsuccessfully sought to find burglar's tools which government witnesses had testified they had dumped into the Mississippi River at a certain point, and that testimony the tools had not been found there would impeach those witnesses in material matters. Of that claim, the court said: "[T]he Government's failure to have advised appellant of its attempted search cannot be claimed to be such a suppression of evidence as would violate due process by having deprived him of the fundamental character of a fair trial.

"Of course, any suppression of evidence favorable to an accused, 'where the evidence is material . . . to guilt,' can constitute a violation of due process. Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215. Evidence material to guilt is, we think, evidence which is of probative character on that question. As to evidence not of that character and having admissibility only for the purpose of impeachment or credibility attack, nondisclosure or suppression, to be violative of due process, would in our opinion, unless the situation is otherwise tainted, have to be of such inherent significance as to represent fundamental unfairness."

In *United States* v. *Cole* (8th Cir.) 453 F.2d 902, 904, the court stated: " 'An application for relief under the discovery rules . . . is a matter within the sound discretion of the district court and is reviewable only for an abuse of discretion.' [Citations]; and an error in administering the discovery rules is not reversible absent a showing that the error was prejudicial to the substantial rights of the defendant."

*United States* v. *Conder, supra* (6th Cir.) 423 F.2d 904, 911, held: "Since we have already determined that the denial of the discovery motions was not an abuse of discretion granted to the District Court under Rule 16, and since the appellants have not offered the slightest hint that the government actually suppressed any exculpatory evidence at the trial, we hold that the denial of the broad discovery motions for all evidence favorable to the appellants was not a denial of due process."

In *United States* v. *Jordan* (2d Cir.) 399 F.2d 610, 615, the court said: "Brady v. State of Maryland merely holds that due process requires the government to produce upon request 'evidence favorable to an accused' which is 'material either to guilt or to punishment.' 373 U.S. at 87, 83 S.Ct. at 1197. It does not require the government to disclose the myriad immaterial statements and names and addresses which any extended investigation is bound to produce. Stokes contends that it is for defense counsel to determine what evidence is favorable to his client. We hold that the decision is one for the trial court, subject to appellate review."

Although the commentary on the American Bar Association Approved Standards states pretrial discovery is required of reports of experts whether the result is "positive" or "negative" or "abortive," that must be viewed in the light of the purposes declared in paragraph 1.1 of the Standards: "(i) to promote an expeditious as well as fair determination of the charges, whether by plea or trial;

"(ii) to provide the accused sufficient information to make an informed plea;

"(iii) to permit thorough preparation for trial and minimize surprise at trial . . . ."[5]

---

[5]Among the Approved Standards of the American Bar Association are:

"2.1    Prosecutor's obligations.

"(a)    Except as is otherwise provided as to matters not subject to disclosure (section 2.6) and protective orders (section 4.4), the prosecuting attorney shall disclose to defense counsel the following material and information within his possession or control:

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(iv)    any reports or statements of experts, made in connection with the par-

Service of those purposes would require that if there were no report other than an abortive one, that should be disclosed. If there has been disclosure of a positive report on a fingerprint, and there is also a report that is "abortive" from the prosecution point of view, it may be doubted that the service of those purposes would require routine disclosure of the latter, although disclosure of a negative report as well as of a positive one would be required.

In *Keith* v. *United States* (9th Cir.) 421 F.2d 1295, 1296, the court said: "This is a case where defendant made a pretrial discovery motion and elected to rest on the adverse ruling as a technical basis for reviewable error without making a record to show prejudice or an error of substance."

In the case at bench, defendant failed to show prejudice or to take any procedural steps, short of a reversal on appeal, to overcome the effect of the trial court's error, if there were error.

I would affirm the judgment.

A petition for a rehearing was denied April 15, 1974, and respondent's petition for a hearing by the Supreme Court was denied June 26, 1974. McComb, J., was of the opinion that the petition should be granted.

ticular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons; [p. 13]

". . . . . . . . . . . . . . .

"4.2 Continuing duty to disclose.

"If, subsequent to compliance with these standards or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified." (P. 99.)

The commentary on the Standards observes: "This subsection makes clear that reports of experts and results of tests must be disclosed whether the report or result is 'positive,' or 'negative,' or abortive (from the prosecutor's standpoint), and whether or not the prosecution intends to use the expert at a hearing or trial. It may well be that many 'negative' reports will have to be disclosed at some time in any event, under the constitutional requirements of *Brady* v. *Maryland.* . . .

"Discoverable under this section would be . . . fingerprint comparisons, . . . and the like. . . . (P. 67.)

". . . . . . . . . . . . . . .

"Two basic categories of exculpatory material and information seem to have been delineated by the courts: (1) that which tends to show the accused not guilty of the offense charged; (2) that which indicates that he should be subject under law (as distinguished from the court's sentencing discretion) to a lesser penalty than would otherwise be indicated." (P. 75.)

". . . . . . . . . . . . . . .

"Difficult questions remain to be solved. For instance, must defense counsel be informed of names and statements of witnesses whom the prosecution has decided not to use at the trial? . . . Mr. Justice Fortas indicates that certainly the prosecution has no obligation 'to communicate preliminary, challenged, or speculative information.' Giles v. Maryland, 386 U.S. 66, 98 (1967) (concurring opinion). But should such memoranda contain information about evidence tending to negate guilt of the accused, that information must be disclosed." (Pp. 77-78.)