[Crim. No. 12848. First Dist., Div. Three. Dec. 3, 1974.]

THE PEOPLE, Plaintiff and Appellant, v.
HUGO A. PINELL et al., Defendants and Respondents.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford Thompson, Sanford Svetcov and W. Eric Collins, Deputy Attorneys General, for Plaintiff and Appellant.

John E. Hill and Robert Y. Bell, under appointments by Court of Appeal, Harold J. Truett, Public Defender, Frank J. Cox, Deputy Public Defender, Lynn S. Carman, Garry, Dreyfus, McTernan, Brotsky, Herndon & Pesonen, Charles R. Garry, David R. Mayer, Howard Moore, Jr., Michael B. Dufficy, Louis F. Hawkins and Mario Obledo for Defendants and Respondents.

Jon Van Dyke, Charles C. Marson, Joseph Remcho, Deborah Hinkel, Peter E. Sheehan, Richard M. Simms III, Julie Kesler-Goeltz, Ephraim Margolin, Paul N. Halvonik, Howard, Prim, Rice, Nemerovski, Canady & Pollak, Jerome B. Falk, Jr., and Tommie W. Whitener as Amici Curiae on behalf of Defendants and Respondents.

## Opinion

**DRAPER, P. J.**—All defendants were indicted for murder (Pen. Code, § 187), conspiracy (Pen. Code, § 182), and assault with a deadly weapon by a prisoner either under life sentence (Pen. Code, § 4500) or a sentence for less than life (Pen. Code, § 4501). All moved to quash the indictment (Pen. Code, § 995) on the ground that the grand jury which returned the indictment in 1971 was improperly chosen.

Respondents contend that "significantly indentifiable elements" of the population of Marin County had been excluded from the pool of 30 names from which the 19 grand jurors for 1971 were drawn. An extended evidentiary hearing was held. Among the witnesses were the judges of the superior court. They solicited names of prospective jurors from a total of 79 civic, labor, ethnic and other organizations of the county, receiving 75 names from that solicitation. They added 30 names they had personally gathered. The judges testified that they collectively sought to obtain a fair cross section of the community, including old and young, male and female, black and white, rich and poor, and those with a knowledge of each section of the county, and that no group was intentionally excluded. Questionnaires were sent to each of the 105 thus chosen. From the replies, the judges unanimously selected 30 names for the grand jury panel. These names were placed in the jury wheel, and the 19 to serve on the 1971 grand jury were chosen by the usual random method.

From the mass of evidence before it, the trial court concluded that "the means used by the selectors did not assure a fair representation of the group to which the moving Defendants belong, to wit: The Blacks, the Latin Americans, the blue collar working class and the young in the pool from which the Grand Jury was selected. The pool was not shown to represent a cross-section of the community."

Whether a group constitutes a "distinct class" in a particular community is a question of fact. (*Hernandez* v. *Texas*, 347 U.S. 475, 478 [98 L.Ed. 866, 870, 74 S.Ct. 667].) There is evidence to support the trial court's finding of four such classes in Marin.

■ But it must be "further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification," to establish that the constitutional guaranties have been violated (*id.*).

■ The mechanics of the selection process here used are well within the scope of the statute (Pen. Code, § 903.4) governing the choice of grand jurors in California. Constitutionality of this statute has been repeatedly upheld by our courts (*In re Wells,* 20 Cal.App.3d 640, 649 [98 Cal.Rptr. 1]; *People* v. *Newton,* 8 Cal.App.3d 359, 388 [87 Cal.Rptr. 394]; *People* v. *Cohen,* 12 Cal.App.3d 298, 309 [90 Cal.Rptr. 612]). The United States Supreme Court has upheld a comparable statute (*Carter* v. *Jury Commission,* 396 U.S. 320, 331-336 [24 L.Ed.2d 549, 558-561, 90 S.Ct. 518]). ■ Thus the law "as written" meets constitutional standards.

The core issue is whether the selection process "as applied" in this case singles out for different treatment any of the classes to which defendants belong.

■ The long-established rule is that equal protection is denied only by a method of selection which "intentionally and systemically" excludes or underrepresents a cognizable class (*Whitus* v. *Georgia,* 385 U.S. 545, 548-552 [17 L.Ed.2d 599, 602-605, 87 S.Ct. 643]; *Hernandez* v. *Texas,* 347 U.S. 475, 476-478 [98 L.Ed. 866, 869-870, 74 S.Ct. 667]; *In re Wells,* 20 Cal.App.3d 640, 649 [98 Cal.Rptr. 1]; *People* v. *Nero,* 19 Cal. App.3d 904, 910 [97 Cal.Rptr. 145]). The rule applies to grand as well as petit juries.[1] Direct proof that elimination or undue reduction of

[1] Deep concern for meticulous care in the selection of trial juries is readily understandable. Under federal as well as California procedures, the trial jury has broad fact-finding powers which go to the essence of fairness and equal protection. We recognize that the federal rule as to grand juries has been extended indiscriminately to all 50 states, regardless of their practice and procedure, and that the courts of California have, with little or no comment, accepted and applied this rule to indictments in California. But the grand jury is solely an accusatory body. Under the federal procedure, the evidence upon which it acted is zealously withheld from the defendant, who is forced to go to trial and can raise no issue of insufficiency of the evidence until the prosecution, at trial, rests its case (see Draper, *State Experience Points Way for Improvement Of Federal Criminal Procedure* (1967) 42 State Bar J. 34). California, since 1927, has required delivery to each indicted defendant of a copy of the transcript of testimony before the grand jury. (Pen. Code, § 938.1, derived from Stats. 1927, ch. 684, p. 1156, § 2 [then Pen. Code, § 925].) The defendant, fully informed by the transcript of the accusatory evidence against him, is given the right to have the indictment set aside upon a judicial determination that such evidence does not constitute reasonable or probable cause to charge him, (Pen. Code, § 995) and to have that determination reviewed by an appellate court (Pen. Code, § 999a). Thus an indicted defendant, before undergoing the burden of trial,

members of a class is intentional or purposeful is frequently impossible. ■ But the element of purpose may be deduced from a substantial history of gross inadequacy of representation of the class. (e.g., *Smith* v. *Texas,* 311 U.S. 128, 131 [85 L.Ed. 84, 86-87, 61 S.Ct. 164]). When a defendant shows such a history, he has made a prima facie case of discrimination, and the burden shifts to the prosecution to explain and justify the discrepancy. Since this grand jury is the first chosen in Marin County under the present method, there is no such history.

■ "Purposeful discrimination is not sustained by a showing that on a single grand jury the number of members of one race is less than that race's proportion of the eligible individuals . . . . Defendants under our criminal statutes are not entitled to demand representatives of their racial inheritance upon juries before whom they are tried . . . . The mere fact of inequality in the number selected does not in itself show discrimination." (*Akins* v. *Texas,* 325 U.S. 398, 403 [89 L.Ed. 1692, 1696, 65 S.Ct. 1276].) ■ Proportional representation is not required, and the proportional limitation necessary to achieve it is forbidden. (*Cassell* v. *Texas,* 339 U.S. 282, 287 [94 L.Ed. 839, 847, 70 S.Ct. 629].)

■ Here there is no evidence of intentional discrimination by the selectors against any of the four groups which the trial court found to exist. Their testimony to the contrary is not disputed. Respondents, however, argue that they met their burden by showing that the selectors had an opportunity to discriminate and that four cognizable groups are statistically underrepresented. The authority they cite (*Alexander* v. *Louisiana,* 405 U.S. 625, 631 [31 L.Ed.2d 536, 542, 92 S.Ct. 1221]) does not support this argument. The one decision most nearly approaching respondents' view (*United States* v. *Butera* (1st Cir. 1970) 420 F.2d 564, 569) notes (fn. 7, p. 568) that it does not create a constitutional standard for the states, but rests upon the supervisory power of the federal appellate courts over the federal trial courts. Moreover, *Butera* holds only that such a situation places upon the government the burden of demonstrating that the disparities are not the product of discrimination. Thus even if the rule be fully applied to the facts before us, it does not result in holding this selection process invalid. We look at each of the four groups involved.

can have a full determination of the adequacy of the evidence to warrant a charge against him. At least arguably, this places a lesser burden upon him than the alternative procedure—complaint by a law officer, preliminary examination before a magistrate, and information filed by a district attorney. In this opinion, we assume applicability of the federal rule to a California indictment. We but note the distinctions in procedure in the somewhat faint hope that they may at least lead to consideration of some amelioration of the federal practice as to grand jury testimony and the setting aside of indictments.

Blacks constitute 6.7 percent of the panel of 30, but only 2.4 percent of the population of Marin County is black. Hence, *Butera* cannot apply. Respondents urge that these black panel members have family incomes substantially in excess of that of the average black. No authority is cited for the view that this bespeaks racial discrimination, or suggests that selection of archetypes is required to avoid an inference of discrimination. A defendant is not entitled to a "jury tailored to the circumstances of the particular case," (*Hoyt* v. *Florida,* 368 U.S. 57, 59 [7 L.Ed.2d 118, 120-121, 82 S.Ct. 159]; *People* v. *Newton,* 8 Cal.App.3d 359, 390-391 [87 Cal.Rptr. 394]).

As to the class of "Latin Americans" found by the trial court to be a cognizable group, the problem of representation is statistically more difficult. Census figures identify but two classes—"Spanish surname" (1.7 percent of the population) and "persons of Spanish language." (4.1 percent.) Respondents variously, and sometimes apparently interchangeably, refer to "Chicanos" (those of Mexican or Central American origin or descent), and "Latinos" (those whose origin or descent traces to countries of South America). Mexican-Americans and "Spanish heritage people," the group which respondents most emphasize, and which the court terms Latin Americans, are natives of Mexico and Central America and their children. Census figures do not cover such a group. One witness for respondents testified that 3,000 of the "Spanish language persons" in Marin County are Mexican-American. It is apparent that it is but a small proportion of the whole. There is evidence that they have a feeling of ethnic identity, experience common economic and educational difficulties, and suffer some job discrimination. This evidence, as we have held, supports the finding that they constitute a cognizable group. But there is no evidence or suggestion of any discrimination by the selectors.

We recognize that where a substantial racial group, long-recognized and visible in the locality, is limited to mere token representation, the discrepancy cannot be excused upon the ground that the selectors knew no qualified persons of the misrepresented race (*Cassell* v. *Texas, supra,* 339 U.S. 282, 289 [94 L.Ed. 839, 848]). It is quite true that although the panel included three classified as "Spanish surname," none were Chicanos or Latin Americans. The selectors here testified that they knew of no organizations of Latin Americans, did not consider this racial group an identifiable group of the population, and for these reasons, did not specifically seek out representation of that group. But *Cassell* obviously is designed to root out disguised discrimination. Here, the record disclosed omission of a group which constituted at most a very small proportion of the population, was not readily visible, was geographically dispersed, pos-

sessed few or no organizations, and was partially assimilated in the general population. A principal complaint of those members of the group who testified was that the group is little known or recognized by the general community. These circumstances sharply differentiate their case from the facts of *Cassell.* There, blacks made up 15.5 percent of the population of Dallas County, Texas. Information as to the qualifications of members of this sizeable group, long existent and well known in the general community, was readily available. Thus "[t]he statements of the jury commissioners that they chose only whom they knew, and that they knew no eligible Negroes in an area where Negroes made up so large a proportion of the population, prove the intentional exclusion that is discrimination . . ." (339 U.S. at p. 290 [94 L.Ed. at pp. 848-849]). There, the claimed blindness of the selectors obviously was self-induced—an intentional closing of the eyes to facts widely known. Here, on the contrary, the group involved is small and by its own members' testimony, not readily recognized by the community generally. In the vast range of racial strains to be found in the average American community, the oversight here bespeaks the opposite of intentional discrimination. There seems no basis for even an "inference of discrimination" under *Butera,* but even if that inference exists, it is fully dispelled by the evidence.

. As to both the classes of youth and "blue collar workers" the selectors' testimony that they made particular efforts to secure their full representation is uncontradicted. There is no evidence of intentional or. systematic exclusion. To suggest a rule in any way based upon some requirement of proportional representation of the many possible divisions of age and economic groups is to introduce an element of extreme and unwarranted difficulty into the jury selection process. (See *Hamling* v. *United States,* 418 U.S. 87 [41 L.Ed.2d 590, 94 S.Ct. 2887]; *People* v. *Johnson,* 38 Cal.App.3d 228, 241, fn. 5 [113 Cal.Rptr. 303].) Respondents focus upon the 21-30 age group. Of the total population of Marin County over the then age of majority, 22 percent were in the 21-30 age bracket, but only 6.6 percent of the panel were in this group. As to "blue collar workers" 25 percent to 29 percent of the population is in that class, and the panel contained 6.6 percent. (We note appellant's contention that 20 percent of the panel had incomes under $9,000, but feel it irrelevant in light of the trial court's use of "blue collar workers" as the relevant class.) But under even the broadest interpretation of *Butera,* "it is not the significant unexplained disparities themselves which are unconstitutional, [citations]; they only raise the inference of discrimination. [Citations.] Once that inference has been raised, it is the government's failure or inability to demonstrate that the disparities are not the product of discrimination which confirms the inference and invalidates the jury pool." (420 F.2d at p. 569.)

Here, the record contains uncontradicted evidence that the selectors made substantial efforts to secure larger numbers of both youth and labor groups. But educational, family and financial obligations rendered many of the younger people unable or unwilling to serve, and of the laboring group, financial consideration left them unable to afford the time necessary to grand jury service. As held in *Butera* itself (420 F.2d at pp. 573-4), these are entirely proper grounds for deletions from the 105 who returned questionnaires to the selectors. And since there is no suggestion of any discrimination in such omissions, any inference which even *Butera* would raise is thoroughly dispelled.

Respondents at most have shown a statistical imbalance in this one grand jury by which one small racial group, the Latin Americans, one age group, the young, and one earning group, the blue collar workers, each was represented on the grand jury panel of 30 by less than its proportion of the total population of the county. But the "mere fact of inequality in the number selected does not in itself show discrimination" (*Akins* v. *Texas, supra,* 325 U.S. at p. 403 [89 L.Ed. at p. 1696]). There is neither evidence nor suggestion of purposeful discrimination by any of the five superior court judges who were the selectors of the panel. Nor, as we have demonstrated, is there any basis for an inference of discrimination. On the contrary, the record discloses a fair and honest effort to secure a panel representing a true cross section of the county population. The trial court did not find otherwise, but held the selectors to an excessively rigorous standard when it looked only to the result, rather than the manner, of the selection. Thus the constitutional standard has not been violated.

The order setting aside the indictment is reversed.

Brown (H. C.), J., and Good, J.,* concurred.

Petitions for a rehearing were denied January 2, 1975, and respondents' petitions for a hearing by the Supreme Court were denied January 29, 1975.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.