**UNITED STATES of America,
Plaintiff,**

v.

**Stanley Charles OLSEN, Defendant.
Crim. No. 4147.**

United States District Court
D. Montana,
Butte Division.
Sept. 30, 1965.

Maurice F. Hennessey and Neil J. Lynch, Butte, Mont., for defendant Stanley Charles Olsen.

Robert T. O'Leary, Asst. U. S. Atty., Butte, Mont., for the United States.

MURRAY, Chief Judge.

Defendant is charged in an indictment with the offense of unlawfully entering a federally insured savings and loan association building with intent to commit larceny therein, in violation of 18 U.S.C. § 2113. The offense is alleged to have occurred at Butte, Montana, on or about January 29, 1965.

Under the provisions of Rule 41(e) of the Federal Rules of Criminal Procedure, the defendant has moved to suppress certain evidence consisting of a shirt, wrench, and various other items, being 11 in total number, alleged to have been obtained as the result of an unreasonable and unlawful search and seizure and in

violation of his rights under the Fourth Amendment to the Constitution of the United States. Pursuant to Rule 41(e) a hearing was held and evidence taken concerning the circumstances surrounding the search for and the seizure of the evidence in question.

The evidence sought to be suppressed was seized from a three-room dwelling house located at 539 Colorado Street in Butte, Montana. No search warrant was obtained, so there is no issue as to the validity of a search warrant. The government seeks to justify the search on the basis of consent, so there is likewise no problem of probable cause involved here. The only questions involved are whether the person who purportedly consented to the search had authority to give such consent, and whether such consent was freely and intelligently given. Both questions must be answered in the negative.

From the evidence adduced at the hearing, it appears that the defendant, under the name of E. R. Nelson,[1] rented the house at 539 Colorado Street on or about December 9, 1964, from its owner, James H. Burchell, who himself lived two doors away in another house. The rental of $35.00 a month was paid in advance on December 9, 1964, covering the month ending January 9, 1965, and on the latter date an additional $35.00 was paid by defendant to Mr. Burchell to cover the rent to February 9, 1965. The uncontradicted testimony of both defendant, and the landlord, Mr. Burchell, is to the effect that at the time of renting the house, the defendant informed Mr. Burchell that he travelled about the state a great deal, and that he might not always be in Butte on the day the rent became due, and Mr. Burchell agreed that it would be all right if he were two or three weeks late with the rent. Mr. Burchell's only concern on that score was that if the weather should become extremely cold during some prolonged absence of the defendant, provision should be made for heating the house to keep the pipes from

freezing. Defendant gave Mr. Burchell permission to enter the house for the purpose of turning on heat and taking care of the pipes. Defendant assumed the utility accounts for gas and electric service to the house when he rented it.

As previously noted, the savings and loan building is charged to have been unlawfully entered on or about January 29, 1965. On February 10, 1965, two agents of the Federal Bureau of Investigation called on Mr. Burchell inquiring with reference to the defendant Stanley Charles Olsen. Mr. Burchell informed the agents that he knew no Stanley Charles Olsen, whereupon the agents secured a photograph of the defendant which Mr. Burchell identified as a picture of the person to whom he had rented the premises at 539 Colorado Street under the name of E. R. Nelson. Burchell informed the agents that he had not seen Olsen for several weeks. It is not entirely clear from the testimony whether on that occasion the two agents asked Mr. Burchell for permission to search and he inquired if they had a search warrant, but it is clear that the two agents left and several hours later four FBI agents returned to Mr. Burchell's residence and after spending some 30 to 45 minutes with Mr. Burchell they obtained a signed statement from him and a signed consent to the search of the premises at 539 Colorado St.

The testimony of the landlord, Mr. Burchell, concerning this alleged consent, which is uncontradicted in any material respect by three of the FBI agents who testified, is quite revealing and bears repetition here:

"Q. Now on the 10th day of February did anything unusual happen concerning the premises that Olsen had rented from you?

A. Well the FBI people come down and tried to find out his whereabouts and so on and so forth, is that what you want?

---

1. Defendant explains the use of an assumed name in the rental of the house on the ground that he was having alimony trouble with a former wife and was attempting to conceal his whereabouts from her.

Q. Yes. When you say the FBI people come down—

A. Yes.

Q. —how many FBI men came to your home?

A. I believe the first time there was two and the second time there was four.

Q. Did they come on two separate occasions on the same day?

A. Not on the same day. I think they came down investigating the first day, and maybe that afternoon or night or the next day there was four came down. I guess they went back and got the boss or somebody, I don't know." (Testimony by the FBI agents establishes that both visits occurred the same day, one in the early afternoon and one in the evening.)

"Q. At that time did they ask permission to enter the premises Olsen had rented from you?

A. Yes.

Q. What was your reply when they asked you that?

A. I told them I thought they should have a search warrant and they told me they didn't need it, they had a right to go in.

Q. You asked for a search warrant and after they told you they had a right to go in, were you in any way concerned about whether they had a right to go in or not?

A. I went and got the ledger and showed them the names and dates and everything and the rent was past due, and when they seen that, they said they had a perfect right to go in there without a search warrant and I had a right to take them over there and let them in and they said they would stand all responsibilities, and under those cases I had no choice, I had to take them over.

Q. You felt you could not oppose their desire to get in the premises?

A. I don't think I could under those conditions."

On cross-examination, he testified:

"Q. Mr. Burchell, you were contacted by the FBI agents on February 10th, the day after the rent had expired, is that correct?

A. Yes.

Q. Did you tell the FBI agents you hadn't seen Mr. Olsen for two or three weeks?

A. Yes.

Q. Did you tell the FBI agents you considered the tenancy to have terminated because of the nonpayment of rent?

A. I didn't tell them that, they told me that.

\*    \*    \*    \*    \*    \*

Q. Mr. Burchell, do you recall being questioned by the FBI agents on the evening of February 10 and giving a signed statement to them?

A. You mean this statement here?

Q. Yes.

A. After they had seen the dates and everything in the book, when they read the rent was past due, they stated they would take the responsibility and they wanted me to sign this slip to give them authority to go in.

Q. That was a consent to search the property, is that right?

A. Yes, that's right I had no choice. I signed it, and they went in."

■ A search and seizure may be made without a warrant if the individual freely and intelligently gives his unequivocal and specific consent to the search, uncontaminated by any duress or coercion, express or implied. State of Montana v. Tomich, CA9–1964, 332 F.2d 987; Pekar v. United States, CA5–1963, 315 F.2d 319; McDonald v. United States, CA10–1962, 307 F.2d 272; Channel v. United States, CA9–1960, 285 F. 2d 217. The above quoted testimony of the landlord, Mr. Burchell, entirely uncontradicted, clearly establishes that his consent to the search of 539 Colorado

Street was not freely and intelligently given, uncontaminated by any duress or coercion, express or implied, and was in fact no consent. Not only was he misled by the agents as to his right to consent to the search of the premises, as will be discussed below, but the fact that his original demand for a search warrant was abandoned only after 30 to 45 minutes of discussion with four FBI agents, and his "what else could I do" attitude in reluctantly consenting to the search, requires a finding of at least implied coercion or duress.

■ Even if by some stretch of the imagination the purported consent by Burchell, the landlord, could be held to be freely and intelligently given, uncontaminated by coercion or duress, the evidence adduced at the hearing on the motion to suppress establishes that Burchell had no right or authority to consent to the search of the premises he had rented to the defendant. It is well established in the law that a landlord owner of premises leased to a tenant cannot validly consent to a search of the leased premises. Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed. 2d 828; Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856. The government concedes this point, but urges that defendant's tenancy of the residence had terminated, and/or that he had abandoned the property. The evidence refutes this contention.

■■ The government relies partly on the undisputed fact that defendant's rent, which was due February 9th, had not been paid on February 10th, when the purported consent was extracted from the landlord and the search made, as establishing that the tenancy had ceased by reason of the non-payment of rent. However, this contention overlooks the undisputed testimony of both the defendant tenant and the landlord that there was an agreement between them that the rent could be paid two or three weeks after the due date. In view of this agreement, the rent was not in fact delinquent on February 10th. Even in the absence of the express agreement that the rent need not be paid on the due date, the mere non-payment of the rent would not have ended the tenancy. In 51 C.J.S. Landlord and Tenant § 104(b) p. 683, the rule is stated:

"In the absence of a statute to the contrary, a tenancy cannot be terminated for a breach of covenant by the lessee unless there is an express and distinct provision in the lease for a forfeiture or right of reëntry on the occurrence of the breach or unless the breach disaffirms or impugns the title of the lessor and tends to defeat the reversion. * * *

"The rule that an express provision in the lease is necessary in order to work a forfeiture applies equally well not only to a breach of covenant to pay rent, but also to the breach" of other covenants.

■ The evidence shows no express provision in the rental agreement between defendant and the landlord for termination of the tenancy and reentry by the landlord on the failure to pay rent, and no Montana statute grants such right. As a matter of fact, when such right of reentry has accrued by virtue of a provision in the lease or otherwise Section 67–525, R.C.M.1947, requires three days written notice before such reentry may be effected.

Other evidence also indicates that both the landlord and defendant considered the tenancy to be still in effect on February 10th despite the non-payment of rent on February 9th. The landlord did not re-rent the property until about a month later; both the landlord and the defendant agree that the defendant owes another month's rent from February 9th, and the defendant paid the utility bill on the premises through March 8, 1965.[2]

2. This payment of the utility bill was not made until the day before the hearing on the motion to suppress and is an entirely self-serving act on defendant's part.

Little weight is given to it in itself, and it is mentioned merely to show that all the evidence in the case points to the con-

Additionally, defendant retained the key to the premises, and left considerable personal property in the premises.

■ In support of the proposition that the defendant had abandoned the premises, the government attempted to show that he fled the city of Butte to avoid being questioned by the FBI. In this attempt the government failed. The testimony of both the defendant and the witness produced by the government concerning the defendant's leaving town is that he left town on the morning of February 3, 1965, because his girl friend, whom he later married, had been given a "floater" out of town by the local authorities. In other words she had been given the alternative of leaving town or serving six months in jail, and the defendant took her to Idaho Falls. Defendant testified he returned to the house on February 7th and left again to be with his girl friend in Idaho Falls on February 8th.

In a discussion concerning what constitutes abandonment or surrender of premises by a tenant, it is stated in 51 C.J.S. Landlord and Tenant § 125b p. 718, "Likewise, there is no surrender (or abandonment) by the lessee where he keeps the key and leaves a portion of his goods on the premises". In this connection, as has been pointed out, the defendant retained possession of the key and left a considerable amount of personal property on the premises. In addition to the items which were seized by the agents, there were in the house at the time of the search various other items, including clothing, shoes or boots, tools and leather craft goods, numerous letters, radio, frying pans, some canned goods, bedclothing and other miscellaneous items. When it is borne in mind that the evidence does not disclose that there was any search for or pursuit of the defendant by the authorities in progress at the time he left, and that his departure was accomplished in a rather leisurely fashion, the fact that he left so much of his personal property in the house at 539 Colorado St., and that he thereafter returned to the house, completely refutes the idea that he abandoned the premises when he left on February 3rd.

■ Finally, the evidence shows that defendant did not return to the premises from February 8, 1965, until a day or two before the hearing on the motion to suppress on September 21, 1965, and the government contends that this prolonged absence shows an abandonment of the premises. In the first place, the defendant explained this continued absence by reason of the fact that he had learned the FBI had searched the premises and had seized some of his property and that the landlord was holding his remaining property and he felt that under those circumstances there was no need to return and claim his property until the case against him had been disposed of. In the second place, the government cannot rely on any intention to abandon the premises that the defendant may have formed after the search and seizure occurred, to justify the prior search and seizure. It is the status of the property at the time of the search and seizure that is controlling, and as pointed out above, all of the evidence establishes that as of that time defendant's tenancy of the property was still in effect and the facts as they existed at that time fail to establish an abandonment of the premises. It, therefore, follows that on February 10, 1965, Mr. Burchell, the landlord, was without authority to consent to a search of the tenant's premises.

The failure of the FBI agents to obtain a search warrant in this case is beyond the court's comprehension. This was not a case of young, inexperienced agents. Three of the four agents who participated in the search testified and had 18, 15 and 14 years experience with the FBI, respectively. The fourth was the Assistant Special Agent in Charge

clusion that both landlord and tenant considered the tenancy in effect even after

the nonpayment of rent on February 9th.

of this division of the Bureau. It is not clear from the evidence whether the four agents who called on Mr. Burchell in the evening of February 10th and conducted the search included the two who had called on him earlier in the afternoon, but it is clear that at least by 5 o'clock in the afternoon the agents knew they wanted to search the premises at 539 Colorado St. Their only excuse for failing to secure a search warrant was that they were unable to contact the United States Attorney or either of the district judges of the District, and that they called their headquarters in Washington and were advised that under the circumstances a warrant was unnecessary if the landlord consented.

Even if it were convincingly shown that it would have been impossible to obtain a warrant on February 10th, which it certainly was not, no reason was shown why the search could not have been delayed until a warrant could have been procured. In Johnson v. United States, 333 U.S. 10 at page 15, 68 S.Ct. 367, at page 369, 92 L.Ed. 436, the Supreme Court stated:

> "No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. No suspect was fleeing or likely to take flight. The search was of a permanent premises, not a movable vehicle. No evidence or contraband was threatened with removal or destruction, except perhaps the fumes which we suppose in time would disappear."

See also Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951, and Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828.

The reasons for proceeding to search without a warrant in the instant case are less compelling than in the Johnson case. In this case there was not even fumes involved which would be likely to disappear, and as for any delay in preparing papers, it would seem a search warrant could have been procured in less time than it took to convince the landlord that he should consent to the search.

For the foregoing reasons the search of the premises at 539 Colorado St., Butte, Montana, on February 10, 1965, must be held to be illegal and unreasonable under the Fourth Amendment to the Constitution of the United States, the defendant's motion to suppress must be granted, and the articles seized in said search, listed in defendant's Exhibit 1 introduced at the hearing on the motion to suppress, must be returned to the defendant, and it is so ordered.