**UNITED STATES of America,**
Appellee,

v.

**Robert M. JORDAN, Harry Lee Stokes and Rita Evonne Brooks,**
Appellants.

No. 533, Docket 31624.

United States Court of Appeals
Second Circuit.

Argued June 18, 1968.

Decided July 30, 1968.

Certiorari Denied Dec. 16, 1968.
See 89 S.Ct. 496.

John W. Condon, Jr., Buffalo, N. Y. (Condon, Klocke & Ange, Buffalo, N. Y., on the brief), for appellant Jordan.

Herald Price Fahringer, Jr., Buffalo, N. Y., for appellant Stokes.

Nathan A. Bork, Buffalo, N. Y. (Mattar, Bork & Mattar, Buffalo, N. Y., on the brief), for appellant Brooks.

Edgar C. NeMoyer, Asst. U. S. Atty. (Thomas A. Kennelly, Acting U. S. Atty. for the Western District of New York, on the brief), for appellee.

Before MOORE and HAYS, Circuit Judges, and TIMBERS, District Judge.*

HAYS, *Circuit Judge:*

Appellants Robert M. Jordan, Harry Lee Stokes and Rita Evonne Brooks were indicted with Robert A. Huitt for bank robbery in violation of 18 U.S.C. Sections 2 and 2113(a), (b) and (c). Count one charged robbery, count two charged larceny of more than one hundred dollars, and count three charged concealment and disposal of stolen money. After a jury trial Jordan and Stokes were convicted on all three counts, Miss Brooks was convicted on count one and acquitted on the remaining counts, and Huitt was acquitted on all counts. Jordan and Stokes were given twenty year prison terms and five thousand dollar fines on count one, into which the court ruled the remaining counts had merged. Miss Brooks was sentenced as a youthful offender to the custody of the Attorney General for treatment and supervision pursuant to 18 U.S.C. § 5010(b). We find no error and the judgments of conviction are affirmed.

On December 9, 1966 two tellers at a branch of the Manufacturers and Traders Trust Company in Buffalo were robbed of nearly twenty-seven thousand dollars. The government contended that Jordan and Huitt were the robbers, that Stokes drove the getaway car, and that Miss Brooks wrote the stickup note. A brief summary of the principal items of evidence against the appellants follows.

Both of the tellers who were robbed identified Jordan as the holdup man. Another witness saw Jordan peering into the bank's windows on the evening before the robbery. Jordan was also seen sitting in a red Buick Riviera parked outside of the bank about ten minutes before the robbery. A currency strap and a number of bills with consecutive serial numbers were found in apartments which had been occupied by Jordan. And Jordan admitted his guilt to a friend.

Stokes was the owner of a red Buick Riviera which closely resembled the car in which the robbers made their escape. Plaster casts showed that the tires on the getaway car were similar to those on Stokes' vehicle. Before the robbery Stokes asked one Willie Lee Ward whether he wanted to "pull a job" with him. Ward declined. Two days after the robbery Stokes showed Ward a roll of bills, and said that Ward should have gone along.

Miss Brooks was implicated primarily by the testimony of a handwriting expert identifying her as the author of the stickup note, which read, "This is a stickup, give all cash recipes and bundled money in draw—no change." Other evidence showed that Stokes' red Buick Riviera was registered in Brooks' name and that she had given a credit statement to the seller of the car at the time Stokes purchased it. Although the evidence against Brooks was less extensive than that against the other appellants, we think that it was sufficient to justify the verdict against her.

## 1. Admission of Evidence of Another Crime

After the government had rested, the court, over objection of defense counsel, permitted the government to reopen its case and call one Craven to the stand. Craven testified that about six or seven weeks after the robbery he was assaulted by Jordan and Stokes, punched, knocked to the ground and kicked in the face. Stokes accused Craven of stealing his sister's purse. Stokes then told Craven to tell whomever he was working for "that they'll never put anything on me because I'm too smart." Later, on separate occasions, Jordan and Stokes each told Craven that they had thought that he had stolen the purse with the intention of turning it over to the police.

After the direct examination was completed, counsel moved that Craven's testimony be stricken. The motion was denied. The court then permitted the

* Of the District Court for the District of Connecticut, sitting by designation.

government to conduct additional direct examination. At this point Craven recalled that Stokes had accused him of taking the purse because the police were interested in the "similarity of serial numbers between the bills in the purse and the money that was missing," and that Stokes had said that he was "facing a possible forty years."

■ These last statements establish a sufficient connection between the assault and the bank robbery to make Craven's testimony admissible as tending to show consciousness of guilt. We cannot say that the court abused its discretion in permitting Craven's story to be considered by the jury. See United States v. Kahaner, 317 F.2d 459, 471–472 (2d Cir.), cert. denied, 375 U.S. 835–36, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963); United States v. Bozza, 365 F.2d 206, 213–14 (2d Cir.1966); United States v. Bradwell, 388 F.2d 619 (2d Cir.1968).

### 2. Motions to Suppress

Jordan and Stokes complain of the denial of their motions to suppress evidence.

Stokes was arrested on the morning of December 17, and at 12:45 p.m. he was taken before the United States Commissioner. Apparently he remained in custody. Later that afternoon and again two days later applications for search warrants were made and granted.

■ Stokes claims that he was entitled under the fourth, fifth and sixth amendments to the assistance of counsel when, after he had been arrested and brought before the Commissioner,[1] applications for search warrants were made. Neither reason nor authority supports this claim. We find nothing so distinctive about post-arrest searches as to require departure from the tradition-

al *ex parte* application procedure conceded to be adequate as to pre-arrest searches. If there is any infirmity in the application for or execution of a search warrant, the accused's rights can be fully protected in a suppression hearing. Perhaps an accused might have grounds for objection if he were arrested solely to permit law enforcement officers to conduct an unsupervised search of his premises. There is nothing in the record to indicate that Stokes' arrest was so motivated.

Lacking direct authority, Stokes argues that the decisions of the Supreme Court in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) establish his claim by implication. We do not believe that either of these cases can properly be read to extend so far. In *Massiah*, which held that certain post-arraignment statements made by an accused in the absence of counsel could not be admitted against him, the Court was careful to point out that its decision did not govern other post-arraignment investigatory procedures:

> "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted." 377 U.S. at 207, 84 S.Ct. at 1203.

In *Wade*, which held that an accused had the right to counsel at a "line-up," the Court distinguished line-ups from those investigative activities which do not require the presence of counsel on the ground that in the latter "there is minimal risk that * * * counsel's ab-

---

1. Stokes contends that the right of counsel attaches after "arraignment" before the Commissioner. Since Stokes was not indicted until about one week after his arrest, he could not have been, and was not, "arraigned" within the meaning of Fed.R.Crim.P. 10 until some days after the applications for warrants were made.

Stokes had, of course, been brought before the Commissioner pursuant to Fed. R.Crim.P. 5 shortly after his arrest, and we consider his point to be that the right to counsel attached at that stage of the proceedings rather than after arraignment.

sence * * * might derogate from [a defendant's] * * * right to a fair trial," 388 U.S. at 228, 87 S.Ct. at 1933. As we have said, a suppression hearing affords full protection.

Jordan's motion to suppress related to evidence found in apartments which he had occupied at 8 Symphony Road and at 90 Gainesborough Street in Boston. Jordan gave written and oral consents to FBI agents to search both apartments. The trial court found that the search at 8 Symphony Road preceded execution of the consent, but sustained that search on the ground that Jordan had abandoned the apartment. Jordan now claims that his consents were not voluntary and that the finding of abandonment lacks support in the evidence.

■ Jordan voluntarily surrendered to FBI agents in Buffalo when he learned that they were looking for him. After receiving full *Miranda* warnings he waived his right to counsel. During the course of an interview with the agents he stated that he had nothing to hide and that the agents could search his apartments if they wished to do so. About two hours later he executed written consents at the request of the agents. Before he signed the consents he was told that he was not required to sign them, that anything found in the apartments could be used against him, and that he was entitled to counsel. These circumstances strongly support the conclusion that the consents were voluntary and the only considerations which would tend to suggest a contrary conclusion are that Jordan was in custody, that he had been told that it would be best to cooperate, and that after the oral consent was given but before the written consents were executed one agent said to another that a warrant could be obtained in any event. Even if this last statement were held to be coercive, but see Gatterdam v. United States, 5 F.2d 673 (6th Cir.1925), it would not vitiate the prior oral consent. The fact that Jordan was in custody is not itself sufficient to render the consent involuntary. See Gorman v. United States, 380

F.2d 158, 163–64 (1st Cir.1967). See also United States v. Paradise, 253 F.2d 319 (2d Cir.1958); Annot., 9 A.L.R.3d 858 (1966).

■ The trial court recognized that the government had a heavy burden of proving voluntary consent, see United States v. Como, 340 F.2d 891 (2d Cir. 1965), but found that the burden had been met. We find no reason to disagree. See United States v. Bracer, 342 F.2d 522, 524–25 (2d Cir.), cert. denied, 382 U.S. 954, 86 S.Ct. 427, 15 L. Ed.2d 359 (1965).

The evidence as to the abandonment of the apartment at 8 Symphony Road is in rather close balance. It is clear that Jordan was in the process of moving from Symphony Road to 90 Gainesborough Street. The only question is whether he had fully abandoned the Symphony Road apartment before December 19th, the date of the search. The FBI agents conducting the search of the Symphony Road apartment found that the rear door of the apartment was unlocked. There were no personal effects in the apartment. Jordan's clothing, musical instruments, dog, and other personal belongings were found in the Gainesborough Street apartment. The superintendent of the Symphony Road apartment testified that rent had been paid only through December 12, a week before the search.

On the other hand, there was testimony that the Gainesborough Street apartment was not habitable until after the 19th because the bathroom was undergoing major repairs. And Jordan testified that he had slept in the Symphony Road apartment on the 18th, the evening before the search. Jordan also claimed that he had paid rent to December 20th and that rent collection procedures were very informal. The keys were not surrendered to the landlord, who did not learn that the apartment was vacant until December 23. The apartment was rented on a weekly basis with furniture and linens supplied, so that the lack of personal belongings is not as strong evi-

dence of abandonment as it might be in the ordinary unfurnished apartment.

 The trial judge resolved this conflicting evidence in favor of a finding of abandonment, principally because he did not credit Jordan's testimony. Because of the judge's opportunity to observe the demeanor of the witnesses the scope of review of a finding of this kind is necessarily narrow. See United States v. Dornblut, 261 F.2d 949, 950–51 (2d Cir.1958), cert. denied, 360 U.S. 912, 79 S.Ct. 1298, 3 L.Ed.2d 1262 (1959). We hold that the finding of abandonment is supported by the record.

### 3. Discovery

Stokes asserts that he was entitled to have from the government under Fed.R. Crim.P. 16(b) and Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), all materials which might be useful in the preparation of a defense, including names and addresses of witnesses whose statements appeared to assist neither the prosecution nor the defense and witnesses who gave no statement.

 To the extent that Rule 16(b) requires discovery of this kind of material at all, it is only on "a showing of materiality to the preparation of [the] * * * defense and that the request is reasonable." The Advisory Committee Notes (printed in 18 U.S.C.A. (Supp. 1967) following Rule 16) state that the "requirement of reasonableness will permit the court to define and limit the scope of the government's obligation to search its files." Clearly the trial court did not abuse its discretion under Rule 16(b) in denying access to the material sought.

 Brady v. State of Maryland merely holds that due process requires the government to produce upon request "evidence favorable to an accused" which is "material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. at 1197. It does not require the government to disclose the myriad immaterial statements and names and addresses which any extended investigation is bound to produce. Stokes contends that it is for defense counsel to determine what evidence is favorable to his client. We hold that the decision is one for the trial court, subject to appellate review.

Stokes also complains that some material in the possession of the government which was disclosed to defense counsel was not disclosed until trial. In the absence of any showing of prejudice we do not consider the complaint substantial.

### 4. Indictment

 Brooks urges that the indictment against her was illegal and void, apparently on the ground that the evidence before the Grand Jury consisted solely of hearsay. The claim is without substance. Contrary to the statement in Brooks' brief, at least two of the witnesses at trial testified before the Grand Jury. Moreover, although direct testimony is to be preferred, United States v. Umans, 368 F.2d 725, 730 (2d Cir. 1966), cert. dismissed as improvidently granted, 389 U.S. 80, 88 S.Ct. 253, 19 L. Ed.2d 255 (1967), hearsay testimony may be considered by a Grand Jury. See Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

### 5. Motion for Severance

 Brooks also asserts error in the denial of her motion for a severance. She contends that the verdict against her must have been infected by the voluminous evidence against the other defendants. The force of this argument is much reduced by the fact that the jury was sufficiently able to separate the evidence against each defendant to acquit Huitt. We find no abuse of discretion. See Opper v. United States, 348 U.S. 84, 94–95, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

The judgments of conviction are affirmed.