UNITED STATES of America,
Plaintiff-Appellee,

v.

Willie SLEDGE and Doni Williams,
Defendants-Appellants.

Nos. 79–1577; 79–1633.

United States Court of Appeals,
Ninth Circuit.

Submitted Feb. 6, 1980.

Decided July 7, 1981.

Alan Zarky, Los Angeles, Cal., argued for defendants-appellants; Roger J. Rosen, Los Angeles, Cal., Phillip A. DeMassa, San Diego, Cal., on brief for Sledge.

Daniel J. Gonzalez, Asst. U. S. Atty., Los Angeles, Cal., for the U. S.

Before KENNEDY, FLETCHER and POOLE, Circuit Judges.

KENNEDY, Circuit Judge:

The question before us is the legitimacy of a police search of appellants' apartment, an apartment which appeared to have been abandoned when in fact the appellants may have intended to return. Appellants were convicted under 21 U.S.C. § 841(d)(1) (1976 & Supp. III 1979) of knowingly and intentionally possessing 55 gallons of piperidine with intention to manufacture phencyclidine (PCP). The principal contention on appeal is that incriminating evidence was illegally seized. We determine the search was valid and affirm.

The circumstances leading to the search were these: appellants, Sledge and Williams, rented an apartment from a landlord named Schammann. On March 1, 1979, the appellants gave Schammann thirty days notice of intent to vacate their apartment "by Sunday, March 31, 1979." The rent had been paid through March. Schammann talked with Sledge and Williams about their leaving early so the apartment could be prepared for new tenants on April 1.

Shortly after March 15, Schammann went to the apartment to ask the tenants when they were going to vacate. No one was there, so he left a note on the door asking them to telephone him. They did not, and no one answered his subsequent calls. In the late afternoon on March 29, Schammann went by the apartment and saw its front door wide open and the entrance hall light on. A few hours later the situation was unchanged. Without entering the apartment, he noticed that the living room and kitchen were empty. He closed the front door but left it unlocked because he had no key to the deadbolt lock Sledge and Williams had installed there. He placed another note on the door asking appellants to call and inform him of their plans.

On March 30, at about 4:00 p. m., Schammann again visited the apartment. A neighbor, Mary Bell, told him she had not seen the appellants around the apartment. The note Schammann had left was still on the door. He entered the apartment. In contrast to the relatively neat condition of the apartment on visits prior to March 29, the apartment was empty of furnishings not belonging to the landlord. The refrigerator, dishwasher and television were gone, along with all living room and bedroom furniture. Various decorative items were gone. There was no food in the apartment. Empty coke bottles, half-empty bottles of liquor, coat hangers, plastic trash pails, trash bags with glass jars in them and a cardboard box with various chemicals in it were strewn about the apartment. A few clothes were found in the apartment. Schammann estimated there were five or six pieces of clothing, including a hat, jacket, slacks, and a coat. Appellant testified at trial that these items had a value of approximately $1,000. The trial court did not specifically indicate whether it found this valuation credible. On the floor of the bedroom was a shotgun beside an open plas-

tic gun case. Schammann presumed the gun did not function.

Schammann concluded that the defendants had vacated their apartment, and with Bell's help be began to clean the apartment. Bell handled the shotgun and it accidentally discharged. She told Schammann the chemicals might be connected with the manufacture of PCP, and Schammann thereupon called an agent of the Drug Enforcement Administration (DEA), who had previously called Schammann to indicate the DEA's interest in Sledge and Williams.

When the agent arrived, Schammann explained his actions of the last several days, and indicated he had retaken possession of the apartment because he thought the tenants had vacated. The agent seized several items in the apartment. Some time after the seizure, appellants came to the apartment building. After Schammann explained the situation, they left. Appellant Williams telephoned Bell at appellants' apartment and asked her to stop cleaning the apartment, saying she (Williams) would clean it herself. In a later telephone conversation with Schammann, Williams indicated that she had no desire to pick up the clothes left in the apartment.

It should be apparent from this recitation of the facts that the DEA agent did not possess a warrant for the search of appellants' apartment. At trial, appellants moved to suppress the drug paraphernalia seized after the entry and search. The trial court denied the motion because

> "[B]ased on the testimony that I have heard, I think it was reasonable for the landlord to conclude, at least by the 30th, that the apartment had been abandoned [. . .] And I think as well, the officer, Mr. Hamm, certainly had reasonable grounds to believe that the apartment had been abandoned or vacated, and its possession had been returned to the landlord."

Reporter's Transcript, Volume 2, p. 259 (transcript of suppression hearing).[1] Our

---

1. The trial court did not conclude that the apartment actually had been abandoned. We do not need to decide that question, for reasons that are evident from the rest of our analysis, though we note that it involves the same general factors relevant to our discussion of apparent abandonment. As is true in analyzing the reasonable appearance of abandonment, a defendant's own and in part self-serving retrospective characterization of his state of mind with respect to the question of intention not to return is not simply and automatically dispositive of the issue.

review of the trial court's denial of the suppression motion requires us to consider whether a search is justified when officers have reasonable grounds to conclude the premises have been abandoned so that authority to permit entry reverts to the landlord, even when in fact the tenant had a subjective or undisclosed intent to return.

The expectations of privacy protected by the fourth amendment, as a general rule, should be measured in objective terms. This follows not only from the proposition that protected expectations are those society as a whole treats as legitimate, itself an objective concept, but also from the premise that "the primary, if not the sole, justification for the exclusionary rule is the deterrence of police conduct that violates Fourth Amendment constitutional rights." *United States v. Ajlouny*, 629 F.2d 830, 840 (2d Cir. 1980). These concepts necessarily imply an objective standard for evaluating police conduct.[2] On the facts of this case, an objective measure for evaluating privacy expectations of the defendant is appropriate, and by this standard the search was lawful.

▮ An officer cannot always assume that an invitation to enter a room or dwelling is necessarily authorized by the rightful occupant. Thus, in *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the police could not assert that a hotel clerk had authority to admit them to the defendant's room. Such an assumption was an implausibly naive view of the law, and not a factually supportable inference of the occupant's probable intent.[3] The case before us, however, is one in which the officer could rely reasonably on the authority of the landlord to admit him to the apartment.[4]

2. *See Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (criteria for fourth amendment protection); *United States v. Calandra*, 414 U.S. 338, 347–48, 94 S.Ct. 613, 619–620, 38 L.Ed.2d 561 (1974) (deterrence purpose).

This point was lucidly explained in *United States v. Taborda*, 635 F.2d 131 (2d Cir. 1980): At first glance Justice Harlan's formulation may appear to require, in part, that a person's actual state of mind be determined. The use of a subjective test as to expectations of privacy has been criticized .... We agree that a purely subjective criterion is not appropriate, and we do not believe it is called for by *Katz*. We note that in his opinion in *Katz*, Justice Harlan's first factor was not precisely an actual expectation of privacy; it was rather the *exhibition* of an actual expectation of privacy. But the requirement that an expectation be "exhibited" is a requirement that "transcend[s] the ... subjective," *see United States v. White*, 401 U.S. 745, 786 [91 S.Ct. 1122, 1143, 28 L.Ed.2d 453] (1971) (Harlan, J., dissenting). We take this first factor to mean in essence that the defendant must have acted in such a way that it would have been reasonable for him to expect that he would not be observed. This, plainly, is an objective rather than a subjective requirement.
*Id.* at 137 (emphasis in original).

3. In *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), police officers approached a hotel clerk and asked him if the defendant was living there; the clerk said he was. *Id.* at 485, 84 S.Ct. at 891. The police obtained the clerk's permission to search the defendant's room, notwithstanding the knowledge that it was still occupied by him. Against this background, the State made the far-reaching claim that the "police, relying on the night clerk's expressions of consent, had a reasonable basis for the belief that the clerk had authority to consent." *Id.* at 488, 84 S.Ct. at 892. The Court held that this claim was without substance. The Court was not presented in that case with a plausible mistake of fact as to the circumstances of the defendant's and the third party's relation to the property searched. Consequently, the Court did not decide what the fourth amendment law should be in such circumstances. Since it was crystal clear to all concerned that the defendant was still living in the hotel room, it would indeed have been "strained" and "unrealistic" to apply an apparent authority doctrine in that situation. *Id.* at 488, 84 S.Ct. at 892. In our view, it would be unwarranted to read *Stoner* as expressing an opinion on the validity of the apparent authority doctrine as applied to facts significantly different from those before it: the distinction is between an implausible mistake of law in *Stoner*, and a much more plausible mistake of fact in this case. *See generally* 2 W. LaFave, Search and Seizure 716–17 (1978).

4. The question left open in *Stoner*, whether apparent authority may suffice to validate a search, *see* note 3, *supra*, was affirmatively answered, at least with respect to containers, in *United States v. Isom*, 588 F.2d 858, 861 (2d Cir. 1978); its theoretical approach is sound, although its analysis of the facts in the specific case has been criticized. *See* 2 W. LaFave, *supra* note 3, at 101–02 nn. 91, 107.1 (Supp.

From a fourth amendment standpoint, the facts of this case show the officer was justified in acting on the landlord's apparent authority to request entry and search of the premises.[5] There was a legitimate basis for the landlord to exercise that authority when premises have been abandoned, and the requisite conditions for abandonment were apparent in the situation the officer confronted.

■ The law of California recognizes that a tenant can abandon the premises to the landlord; abandonment turns on the intent of the lessee. As in the law of contracts, the parties to the transaction and third persons are entitled to rely on intention as it objectively appears, not on an intention that is subjectively disclosed after there has been reliance or a change of position.[6]

1981). A similar approach was used in *United States v. Lopez-Diaz*, 630 F.2d 661, 666–67 (9th Cir. 1980); this reasoning was foreshadowed to some extent by *United States v. Miles*, 480 F.2d 1217, 1219 (9th Cir.) (per curiam), *cert. denied*, 414 U.S. 1008, 94 S.Ct. 369, 38 L.Ed.2d 245 (1973). *See also Nix v. Alaska*, 621 P.2d 1347, 1349–50 (1981) (apparent authority suffices for search of occupied residence).

The contrary approach followed by the Seventh Circuit, *see Wilson v. The Health and Hosp. Corp.*, 620 F.2d 1201, 1208–14 (7th Cir. 1980); *United States v. Matlock*, 476 F.2d 1083, 1087 (7th Cir. 1973), *rev'd on other grounds*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), appears dubious for two reasons. First, the court appeared to apply an automatic standing analysis that has since been disapproved. *See United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (overruling *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)); *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). *Cf. Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S.Ct. 421, 430–431 n.12, 58 L.Ed.2d 387 (1978) ("[E]ven a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon.") Second, it seems somewhat redundant to require, as the Seventh Circuit appears to, both actual authority and the manifest appearance of actual authority. *See* 2 W. LaFave, *supra* note 3, at 725.

5. We have already discussed *Stoner* in this connection. *See* note 3 *supra*. The factual circumstances of this case, *see* pp. 1079–1081 & nn. 7, 11 *infra*, also serve to reconcile other cases with *Lopez-Diaz*. In *Cunningham v. Heinze*, 352 F.2d 1 (9th Cir. 1965), *cert. denied*, 383 U.S. 968, 86 S.Ct. 1274, 16 L.Ed.2d 309 (1966), the defendant and the third party shared a house. The third party consented to a search of defendant's bedroom. Narcotics were discovered in the bedroom closet. We held that the evidence must be suppressed because there was no showing that the third party had actual authority over the defendant's bedroom. The distinction from *Lopez-Diaz*, and the analysis in text, is clear. A reading of the *Cunningham* opinion's account of the con-

versation between the officers and the third party makes it evident that the officers in the earlier case knew they were searching a bedroom reserved to the exclusive, present, and continuing use of one other than the third party. The circumstances of *United States v. Botelho*, 360 F.Supp. 620 (D.Haw.1973), were similar. Although the rent for the beach cottage in that case was overdue, the officers knew that the defendant continued to reside there, and they kept the cottage under surveillance in order to arrest the defendant, which they accomplished on the night of the search in question. One can infer that the facts were similar in *United States v. Olsen*, 245 F.Supp. 641 (D.Mont.1965), although the opinion is not completely clear on this point.

6. The plaintiff in *Martin v. Cassidy*, 149 Cal. App.2d 106, 307 P.2d 981 (1957), appealed the trial court's finding of abandonment. He had lived on a lot belonging to defendant under a five year written lease agreement with the defendant, where he conducted a fruit selling business. He had many kinds of business and personal fixtures, as well as ordinary personal property, located on the premises, including a house trailer, an automobile, and unspecified business equipment. The defendant attempted to collect rent without success and began to remove property. The defendant's testimony regarding plaintiff's alleged statement showing an intent to relinquish his interest in the property was somewhat incredible in that at the time he was alleged to have made it he was paying a full month's rent in advance. The only really solid evidence to the contrary, supporting defendant's assertions that the property was abandoned, consisted of the plaintiff's failure to pay rent and his being jailed for vagrancy during part of the time in question. Nevertheless, in spite of what might appear to be extremely significant evidence against a finding of abandonment, and notwithstanding its rather broad enunciation of the rule governing abandonment, the California Court of Appeal affirmed the trial court's finding of abandonment with language that is pertinent here:

It is apparent that it might well be inferred from the record that appellant did not intend to surrender and abandon the leased premis-

■ The officer in the case before us acted with care to determine the landlord's authority to admit him. He reviewed the landlord's recitation of the facts which indicated abandonment. The facts were consistent with his own observations and knowledge of the case. He was entitled to assume that the appellants' expectation of privacy had not survived the landlord's apparent right to enter the property and to consent to its search by law enforcement officers.[7] An abandonment by the owner

es but a careful study of the record convinces us that it cannot be held as a matter of law that there is no substantial evidence to support the court's finding of abandonment. [...] We believe that the issue was one of fact for the trial court to determine and under familiar rules governing appellate courts we must accept the finding of the trial court. *Martin v. Cassidy,* 149 Cal.App.2d 106, 112, 307 P.2d 981, 985 (1957).

In *Kassan v. Stout,* 9 Cal.3d 39, 106 Cal.Rptr. 783, 507 P.2d 87 (1973), there was a claim of abandonment raised against plaintiffs when they attempted to transfer a lease arguably in violation of the lease agreement. The Supreme Court of California held that the trial court's finding of abandonment could not be sustained on appeal when the only evidence concerning an intention to relinquish an interest in the premises was that the plaintiffs desired to assign their leasehold, and in addition occupancy of the premises and payment of the rent were continuous. *Martin v. Cassidy, supra,* laid out the rule that a nonuse must be coupled with an intent to relinquish all rights in a premises to support a finding of abandonment, 149 Cal. App.2d at 110, 307 P.2d at 984. Nevertheless, the Court of Appeal in *Martin* sustained the trial court's finding of abandonment in exceptionally ambiguous circumstances, discussed above. In this connection it must be borne in mind that the very broad statement of the applicable property principle in cases such as *Martin* must be read in connection with its application by California courts to specific facts.

7. Though Ms. Williams told Ms. Bell to stop cleaning the apartment, there was no testimony that this message was relayed to either Schammann or to the agent. The agent's account of the circumstances apparent to him at the time of the search is as follows:

"I, CHARLES H. HAMM, declare as follows:
1. I am a Special Agent of the Drug Enforcement Administration (DEA).
2. On March 30, 1979, Mr. Peter Schammon [*sic*] called my office and spoke with my secretary. My secretary told me that Mr. Schammon wanted to see me at 401 11th street, Huntington Beach, California. Mr. Schammon was known to me as the owner of an apartment building located at that address. During a DEA investigation, I had previously contacted Mr. Schammon, and he had identified Willie Sledge and Doni Simone Williams as the occupants of Apartment C, 401 11th Street, Huntington Beach. I was further informed by my secretary that Mr. Schammon had discovered various chemicals, glassware, and plastic materials along with a shotgun in Apartment C.
3. I contacted Mr. Schammon at the apartment building at approximately 5:30 P.M. Mr. Schammon told me that he had been trying to contact Sledge and Williams for sometime. He had even left a large note taped to the front door of the apartment requesting that Sledge and Williams call him. Mr. Schammon said that Sledge and Williams began moving their possessions out of the apartment about two weeks previously. Mr. Schammon drove by the apartment on March 29, 1979 at about 5:00 P.M. He observed that the lights were on and the apartment door was wide open. Mr. Schammon returned at 10:00 P.M. and found the conditions unchanged. He secured the apartment.
4. Mr. Schammon returned on the afternoon of March 30, 1979 and took possession of his apartment because he believed that Sledge and Williams had quit the premises. Mr. Schammon contacted Ms. Mary Bell who lived next door to clean the apartment and make it suitable for a new tenant. While cleaning the apartment, they discovered various chemicals, glassware and plastic containers along with a loaded 12 gauge shotgun. Mr. Schammon further told me that at that point he called my office and told my secretary that he wanted assistance on what to do with the property.
5. I further questioned Mr. Schammon about when Sledge and Williams had left the apartment. He told me that they had contacted him at the beginning of the month and said they were moving and giving up the apartment. Approximately two weeks prior to March 30, 1979 Sledge and Williams had moved their furniture out of the apartment. Mr. Schammon advised me that the only other time Sledge and Williams had been back to the apartment was apparently the day before and then for only a short time, leaving the front door open and the light on. It should be noted that on February 28, 1979, I spoke with Sledge in the City of Commerce. During the conversation, I informed Sledge that I was aware he was living in Huntington Beach. That conversation apparently took place just prior to Sledge notifying Mr. Schammon he and Williams were quitting the apartment."

Declaration of C. Hamm, Excerpts of the Clerk's Record at 50–51.

or possessor of property ends his reasonable expectation of privacy.[8] If one who has abandoned property from all outward appearances in fact has retained a subjective expectation of privacy, then a search of the property is nevertheless valid if that expectation is intrinsically unreasonable or not otherwise entitled to protection.[9] Abandonment, as in this case, may confer upon a third person with a continuing or residual interest an authority which is sufficient to authorize him to consent to a search.[10]

■ There is authority in this circuit for the proposition that a search is not invali-

---

The circumstances of this case therefore make it unnecessary for us to decide whether the bare assertion by a third party of authority to consent, without more, may be relied on by police so as to obviate a need for attempted verification, see 2 W. LaFave, supra note 3, at 722–23, and when an assertion by a third party of authority to consent may be made in such fundamental bad faith as to make reliance on it by police questionable. Cf. United States v. Harris, 534 F.2d 95 (7th Cir. 1976) (bald assertion of authority by defendant's friend, who did not possess key to defendant's apartment and did not live there, insufficient to authorize police search); United States v. Heisman, 503 F.2d 1284, 1287–89 (8th Cir. 1974) (search not validly authorized by third party when only evidence of authority at time of search was affirmative answer to police question whether he "assumed" he had access to defendant's room).

8. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

9. See page 1077 & note 2 supra.

10. It is possible to view the search in question here as a consent search in yet another way, one suggested by the doctrine of fourth amendment "assumption of risk." See United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). This doctrine is more fully developed in intermediate appellate decisions. For example, it is the ordinary rule that a relation between a third party and a defendant of landlord-lessee, without more, does not actually authorize the third-party landlord to consent to a search of the demised premises during the period of the defendant-tenant's occupancy or tenancy. See Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). However, coexistent with this rule is the principle applied to cases in which some third party has actual authority for a limited access to the defendant's premises, and that access is sufficient to include plain sight of the incriminating evidence within its scope. Such cases have sometimes held that the police have the authority to stand in the shoes of that third party. United States v. Gradowski, 502 F.2d 563 (2d Cir. 1974) (per curiam); United States v. Hersh, 464 F.2d 228 (9th Cir.) (per curiam), cert. denied, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972). "[This] simply allows the warrantless 'seizure' of evidence visible to the official or any member of the general public while they are located where they are lawfully allowed." Wilson v. The Health and Hosp. Corp., 620 F.2d 1201, 1210 (7th Cir. 1980). "If the landlord had a right to enter the room, then the initial discovery was not illegal." United States v. Wilson, 472 F.2d 901, 902 (9th Cir. 1972), cert. denied, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973). Other decisions have also implied that a defendant may assume the risk that the third party will at times exceed the scope of authorized access, as that is defined in precise and narrow terms. See United States v. Cook, 530 F.2d 145 (7th Cir.) (search of outbuilding held lawful when landlady consents to search of part of building other than that segregated for her own use; search covered area not actually used by third party and arguably in excess of her foreseeable use of the building), cert. denied, 426 U.S. 909, 96 S.Ct. 2234, 48 L.Ed.2d 835 (1976); United States v. Murphy, 506 F.2d 529 (9th Cir. 1974) (per curiam) (employee having key may consent to search of employer's warehouse, even though employee's possession of key for limited purpose of performing services for owner of premises), cert. denied, 420 U.S. 996, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975).

Paragraph 11 of the lease agreement allows reasonable access for the landlord to show the premises to prospective new tenants. Ordinarily this would require advance notice to, and permission of, the tenants in possession. However, at the end of a lease when the apartment appears to be unoccupied and to have been emptied of anything the tenants did not seem to wish to leave behind, and after the landlord's repeated and earnest efforts to contact the tenants to ascertain their plans, the landlord's independent decision to enter the apartment may or may not be permissible. Such a theory was implied by our holding in United States v. Wilson, supra, that there was an actual reversion of authority to the landlord for fourth amendment purposes, despite a trial court determination to the contrary. See 472 F.2d at 903. The briefs in this appeal raised this issue, but it was not relied on by the trial court, so we need not decide whether the factors just mentioned bring this case within the principle applied in the decisions just cited.

dated where a police officer in good faith relies on what reasonably, if mistakenly, appears to be a third party's authority to consent to the search. *United States v. Lopez-Diaz*, 630 F.2d 661, 666–67 (9th Cir. 1980). This follows necessarily from the view that the fourth amendment protects privacy interests that society deems reasonable and legitimate, and this objective test of reasonableness must be present regardless of the private state of mind of the person who asserts the interest.[11]

In *Lopez-Diaz*, police were notified that one Cawley would arrive in Salem with heroin. Cawley and the defendant arrived in the van and were arrested. Cawley consented to a search of the van, which belonged to his wife. Pillow cases containing personal belongings of defendant Lopez-Diaz were found and searched, and heroin and cocaine were found in the pillow cases. It was clear to the court the pillow cases did belong to the defendant rather than to Cawley; the question the court addressed was whether Cawley's consent extended to them. The court held that since it was not obvious at the time of the search that the property did not belong to the defendant alone, and neither Cawley nor the defendant objected, "the police might reasonably

conclude that Cawley's consent included within its scope the pillow cases." [12]

Our holding is supported by *United States v. Wilson*, 472 F.2d 901 (9th Cir. 1972), *cert. denied*, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973), although there are significant differences between that case and this. In *Wilson*, we held that there was no justifiable expectation of privacy and the fourth amendment permitted a warrantless search regardless of Arizona law which, at least arguably, could have been interpreted to give the tenant a continued interest in the premises regardless of an intent to abandon. We stated:

> The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned. *Katz v. United States*, 389 U.S. 347, 351 [88 S.Ct. 507, 511, 19 L.Ed.2d 576] (1967). As Mr. Justice Frankfurter stated in *Jones v. United States*, 362 U.S. 257 [80 S.Ct. 725, 4 L.Ed.2d 697] (1960): 'We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from

---

**11.** The policy behind this proposition is that application of the exclusionary rule would be pointless in circumstances in which it could be expected to have no prospective deterrent effect on police officers that would conduce toward more faithful observation of the fourth amendment. "[T]he test is the appearance rather than the actuality of the circumstances, as the officer can only act on the basis of things as they appear to him." The American Law Institute, A Model Code of Pre-Arraignment Procedure 150 (Proposed Official Draft 1975). This proposition is congruent with the fourth amendment's prerequisite that defendants affirmatively manifest their privacy expectation by behavior in order to assert a privacy interest immune from warrantless intrusion. *See United States v. Taborda*, 635 F.2d 131, 137 (2d Cir. 1980); page 1077 & note 2 *supra*.

The Model Code's version of the exclusionary rule is contained in two sections. "The consent justifying a search and seizure ... must be given, in the case of ... (c) search of premises, by a person who by ownership or otherwise, is apparently entitled to determine a giving or withholding of consent." The American Law Institute, A Model Code of Pre-arraignment Procedure § 240.2(1)(c) (Proposed Official

Draft 1975). The ultimate validity of a search based on what reasonably appeared at the time of the search to be a third-party's authority must be determined in light of a second section, *id.* § 290.2(1)(d)(ii), (3), (4), which provides that a suppression motion may be made if the apparent authority should turn out to have been illusory, but the motion will be granted only if the violation is "substantial," as defined by six factors set out therein.

The Supreme Court of the United States has endorsed this idea in similar terms:

> If the purpose of the exclusionary rule is to deter unlawful police conduct then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

*United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975) (applying policy of exclusionary rule to retroactivity issue).

**12.** *See* notes 4, 5, & 11 *supra*.

unreasonable searches and seizures subtle distinctions developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical . . . .' 362 U.S. at 266 [80 S.Ct. at 733].

472 F.2d at 902–03.

*Wilson* teaches that concepts of state property law are relevant, but not necessarily dispositive, for deciding the question whether there was a legitimate privacy interest for fourth amendment purposes. *See also Rakas v. Illinois,* 439 U.S. 128, 143 n.12, 99 S.Ct. 421, 430–431 n.12, 58 L.Ed.2d 387 (1978) (discussing limited relevance of state property law and fourth amendment questions); *United States v. Kress,* 446 F.2d 358, 361 (9th Cir.), *cert. denied,* 404 U.S. 947, 92 S.Ct. 304, 30 L.Ed.2d 264 (1971), (entry by manager and finding of abandonment upheld even though defendants had month to month tenancy which could not be terminated without giving notice as required by statute.) The justification for finding actual abandonment for fourth amendment, as distinct from property law, purposes, is at least as clear here as it was in *Wilson,*[13] and a fortiori it supports the conclusion that both the landlord and the officers acted reasonably in relying on the appearance of abandonment. The ultimate requirement is reasonableness under the fourth amendment, not strict compliance with technical state law concepts, and we think the requirement of fourth amendment reasonableness is satisfied here.

AFFIRMED.

FLETCHER, Circuit Judge, dissenting:

From a review of the facts, I believe that defendants exhibited a subjective expectation of privacy which society should be prepared to recognize as reasonable, *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Accordingly, I dissent.

Defendants had paid the rent to the end of their unexpired lease period, had left valuable items in the apartment, had not yet forfeited their cleaning deposit, had not surrendered keys or advised the landlord that they had vacated, and did in fact return to the apartment. All but the last of these facts were known to the landlord at the time of the search, and were conveyed by the landlord to the government agents.

The only facts suggesting abandonment were that the apartment's door had been open for a period of several hours the previous day until closed by the landlord, that the landlord's note had not been removed from the door, and that the apartment was in considerable disarray. I cannot agree that these facts give rise to a reasonable belief that the apartment had been abandoned. To the contrary, they are at least as consistent with the conclusion that defend-

---

**13.** In *United States v. Wilson* the defendant had left behind various articles of clothing as well as a television set. Analogous cases of federal officers searching apparently abandoned premises are found in other circuits. The federal agents in *United States v. Jordan,* 399 F.2d 610 (2d Cir.), *cert. denied,* 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968), searched the defendant's apartment before he executed a consent. The case is analogous to this one in that the defendant was in the process of moving from his old apartment, which was searched, to a new apartment. The Second Circuit affirmed the trial court's finding of actual abandonment, even though it was apparently not disputed that the defendant was only in the process of moving at the time. The evidence clearly supporting abandonment included leaving the rear door to the apartment unlocked, and moving personal effects to the new apartment. The testimony on whether the rent was paid up for the period of the search was in doubt. The rather substantial evidence opposing a finding of abandonment included the defendant's not yet having returned his keys to the landlord, uncontradicted testimony that he was still living in the apartment and slept there the night before the search, and most important, that his new apartment was not yet habitable because it was in the process of major repairs. In *Feguer v. United States,* 302 F.2d 214, 248–50 (8th Cir.) (Blackmun, J.), *cert. denied,* 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962), the Court of Appeals affirmed the trial court's finding that the defendant had left his room with an intent not to return on July 11, even though he had paid rent through July 14; the defendant thus conceded abandonment on appeal.

ants were in the last stages of vacating their apartment before the expiration of their tenancy. If the government agents had no reasonable belief that the apartment was abandoned, the fact that the apartment door had been left open would not justify their intrusion. *Wilson v. Health & Hospital Corp.*, 620 F.2d 1201 (7th Cir. 1980). I would reverse.